# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 19, 2013           Decided July 23, 2013

No. 07-5347

MENACHEM BINYAMIN ZIVOTOFSKY,
BY HIS PARENTS AND GUARDIANS ARI Z. AND NAOMI SIEGMAN
ZIVOTOFSKY,
APPELLANT

v.

SECRETARY OF STATE,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01921)

———

*Nathan Lewin* argued the cause for the appellant. *Alyza D. Lewin* was on brief.

*Robert G. Kidwell* was on brief for *amici curiae* Anti-Defamation League et al. in support of the appellant.

*David I. Schoen* was on brief for *amicus curiae* Zionist Organization of America in support of the appellant.

*Paul Kujawsky* was on brief for *amicus curiae* American Association of Jewish Lawyers and Jurists in support of the appellant.

*Gregory E. Ostfeld*, *Elliot H. Scherker* and *Marc Stern* were on brief for *amicus curiae* American Jewish Committee in support of the appellant.

*Theodore B. Olson* was on brief for *amici curiae* Members of United States Senate et al. in support of the appellant.

*Dana Kaersvang*, Attorney, United States Department of Justice, argued the cause for the appellee. *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen, Jr.*, United States Attorney, and *Harold Hongju Koh*, Legal Adviser, United States Department of State, were on brief. *Lewis Yelin* and *Douglas N. Letter*, Attorneys, United States Department of Justice, and *R. Craig Lawrence*, Assistant United States Attorney, entered appearances.

Before: HENDERSON, ROGERS and TATEL, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* TATEL.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Section 214(d) of the Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, 116 Stat. 1350, requires the Secretary (Secretary) of the United States Department of State (State Department) to record "Israel" as the place of birth on the passport of a United States citizen born in Jerusalem if the citizen or his guardian so requests. *Id.* § 214(d), 116 Stat. at 1366. The Secretary has not enforced the provision, believing that it impermissibly intrudes on the President's exclusive authority under the United States Constitution to decide whether and on what terms to recognize foreign nations. We

agree and therefore hold that section 214(d) is unconstitutional.

## I. BACKGROUND

The status of the city of Jerusalem is one of the most contentious issues in recorded history. For more than two millennia, the city has been won and lost by a host of sovereigns. The controversy continues today as the state of Israel and the Palestinian people both claim sovereignty over the city. It is against this background that the dispute in this case arises.

Since the middle of the twentieth century, United States Presidents have taken a position of strict neutrality on the issue of which sovereign controls Jerusalem. After Israel declared its independence in 1948, President Harry S Truman promptly recognized it as a foreign sovereign. *See* Robert J. Reinstein, *Recognition: A Case Study on the Original Understanding of Executive Power*, 45 U. RICH. L. REV. 801, 804 (2011). Nevertheless, Presidents from Truman on have consistently declined to recognize Israel's—or any country's—sovereignty over Jerusalem. When Israel announced in 1948 that it intended to convene the inaugural meeting of its Parliament in a part of Jerusalem that it controlled, the United States declined to send a representative to attend the ceremonies; a State Department cable explained that "the United States cannot support any arrangement which would purport to authorize the establishment of Israeli . . . sovereignty over parts of the Jerusalem area." Shlomo Slonim, *Jerusalem in America's Foreign Policy, 1947-1997* at 123 (1998). During United Nations proceedings in 1967, the United States ambassador stated that the "continuing policy of the United States Government" was that "the status of Jerusalem . . . should be decided not unilaterally but in consultation with all concerned." U.N. GAOR, 5th Emergency Sess., 1554th plen. mtg. ¶¶ 98-99, U.N. Doc.

A/PV.1554 (July 14, 1967) (quotation marks omitted). As the Secretary summarized in response to interrogatories proposed in this case:

> Within the framework of this highly sensitive, and potentially volatile, mix of political, juridical, and religious considerations, U.S. Presidents have consistently endeavored to maintain a strict policy of not prejudging the Jerusalem status issue and thus not engaging in official actions that would recognize, or might be perceived as constituting recognition of, Jerusalem as either the capital city of Israel, or as a city located within the sovereign territory of Israel.

Def.'s Resps. to Pl.'s Interrogs. at 9, *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, No. 03-cv-1921 (D.D.C. June 5, 2006) (Joint Appendix (JA) 59). Therefore, "[t]he United States, like nearly all other countries, maintains its [Israeli] embassy in Tel Aviv," *id.* at 8 (JA 58) (quotation marks omitted), not Jerusalem.

The State Department's Foreign Affairs Manual (FAM) contains passport administration rules that reflect the policy of neutrality. The FAM first directs in detail how the applicant's birthplace is to be stated on his passport. "As a general rule, enter the country of the applicant's birth in the [place of birth field on the] passport." 7 FAM 1383.1 (2002) (JA 111).[1] If, however, the applicant was born "in territory disputed by another country, the city or area of birth may be written" in lieu of the country. 7 FAM 1383.5-2 (JA 113). Similarly, an applicant may request that his passport list the "city or town, rather than the country, of [his] birth." 7 FAM 1383.6(a) (JA

---

[1] All FAM provisions cited herein refer to the 2002 version, which was in effect during the relevant events.

115). Regarding Jerusalem, the FAM sets forth a detailed policy:

> For applicants born before May 14, 1948 in a place that was within the municipal borders of Jerusalem, enter JERUSALEM as their place of birth. For persons born before May 14, 1948 in a location that was outside Jerusalem's municipal limits and later was annexed by the city, enter either PALESTINE or the name of the location (area/city) as it was known prior to annexation. For persons born after May 14, 1948 in a location that was outside Jerusalem's municipal limits and later was annexed by the city, it is acceptable to enter the name of the location (area/city) as it was known prior to annexation . . . .

7 FAM 1383.5-6 (JA 115). The FAM specifically provides that, for an applicant born in Jerusalem: "Do not write Israel or Jordan" on his passport and, further, that Israel "[d]oes not include Jerusalem . . . ." 7 FAM 1383 Ex. 1383.1 pt. II (JA 127). In sum, the State Department must record "Jerusalem"—not "Jerusalem, Israel" or "Israel"—as the place of birth on the passport for an applicant born in Jerusalem after 1948.

Recently, the Congress has attempted to alter the Executive branch's consistent policy of neutrality. In 1995, it enacted the Jerusalem Embassy Act, which provides that "Jerusalem should be recognized as the capital of the State of Israel"; "the United States Embassy in Israel should be established in Jerusalem no later than May 31, 1999"; and "[n]ot more than 50 percent of the funds appropriated to the Department of State for fiscal year 1999 for 'Acquisition and Maintenance of Buildings Abroad' may be obligated until the Secretary of State determines and reports to Congress that the United States Embassy in Jerusalem has officially opened." Pub. L. No. 104-45, § 3(a)-(b), 109 Stat. 398, 399 (1995)

(enacted into law without President's signature). During the Congress's consideration of the legislation, the Executive branch communicated with the Congress regarding its constitutionality. *See* 164 CONG. REC. S15,463 (daily ed. Oct. 23, 1995). The United States Department of Justice (DOJ) *via* an assistant attorney general wrote to the White House Counsel: "It is well settled that the Constitution vests the President with the exclusive authority to conduct the Nation's diplomatic relations with other States," that "the President's recognition power is exclusive" and that "[t]he proposed bill would severely impair the President's constitutional authority to determine the form and manner of the Nation's diplomatic relations." *Id.* at S15,468. The DOJ official explained that his conclusions were "not novel"; for example, "[t]he Reagan Administration objected in 1984 to a bill to compel the relocation of the United States Embassy from Tel Aviv to Jerusalem, on the grounds that the decision was so closely connected with the President's exclusive constitutional power [and] responsibility to recognize, and to conduct ongoing relations with, foreign governments as to, in our view, be beyond the proper scope of legislative action." *Id.* at S15,469 (quotation marks omitted). Similarly, the then-Secretary expressed opposition to the legislation in a letter to the Senate Majority Leader. *Id.* The Secretary explained that "[t]here is no issue related to the Arab-Israeli negotiations that is more sensitive than Jerusalem" and "any effort by Congress to bring it to the forefront is ill-advised and potentially very damaging to the success of the peace process." *Id.* He echoed the DOJ official's doubts regarding the bill's constitutionality. *Id.* Ultimately, the Congress enacted the legislation with a waiver provision authorizing the President to suspend the funding restriction for six-month periods to "protect the national security interests of the United States." Pub. L. No. 104-45 § 7, 109 Stat. at 400.

On September 30, 2002, President George W. Bush signed into law the Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, 116 Stat. 1350. Section 214(d) is the provision at issue and it provides:

> (d) RECORD OF PLACE OF BIRTH AS ISRAEL FOR PASSPORT PURPOSES.—For purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel.

*Id.* § 214(d), 116 Stat. at 1366.[2] When the President signed the Act, however, he also issued a signing statement, noting

---

[2] Section 214 provides in full:

SEC. 214. UNITED STATES POLICY WITH RESPECT TO JERUSALEM AS THE CAPITAL OF ISRAEL.

(a) CONGRESSIONAL STATEMENT OF POLICY.—The Congress maintains its commitment to relocating the United States Embassy in Israel to Jerusalem and urges the President, pursuant to the Jerusalem Embassy Act of 1995 (Public Law 104–45; 109 Stat. 398), to immediately begin the process of relocating the United States Embassy in Israel to Jerusalem.

(b) LIMITATION ON USE OF FUNDS FOR CONSULATE IN JERUSALEM.—None of the funds authorized to be appropriated by this Act may be expended for the operation of a United States consulate or diplomatic facility in Jerusalem unless such consulate or diplomatic facility is under the supervision of the United States Ambassador to Israel.

(c) LIMITATION ON USE OF FUNDS FOR PUBLICATIONS.—None of the funds authorized to be appropriated by this Act may be available for the publication of any official government document which lists countries and

that "the Act contains a number of provisions that impermissibly interfere with the constitutional functions of the presidency in foreign affairs," including section 214:

> Section 214, concerning Jerusalem, impermissibly interferes with the President's constitutional authority to conduct the Nation's foreign affairs and to supervise the unitary executive branch. Moreover, the purported direction in section 214 would, if construed as mandatory rather than advisory, impermissibly interfere with the President's constitutional authority to formulate the position of the United States, speak for the Nation in international affairs, and determine the terms on which recognition is given to foreign states. U.S. policy regarding Jerusalem has not changed.

Statement on Signing the Foreign Relations Authorization Act, Fiscal Year 2003, 2002 WL 31161653 (Sept. 30, 2002).

Menachem Zivotofsky (Zivotofsky) is a United States citizen born in 2002 in Jerusalem to parents who are United States citizens. Compl. ¶¶ 2-5, *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, No. 03-cv-1921 (D.D.C. Sept. 16, 2003) (JA 8-9); *see also* 8 U.S.C. § 1401(c) (making "national[ ] and citizen[ ] of the United States at birth . . . a person born

---

their capital cities unless the publication identifies Jerusalem as the capital of Israel.

(d) RECORD OF PLACE OF BIRTH AS ISRAEL FOR PASSPORT PURPOSES.—For purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel.

Pub. L. No. 107-228 § 214, 116 Stat. at 1365-66.

outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person"). In 2002, Zivotofsky's mother applied for a United States passport for Zivotofsky, listing his birthplace as "Jerusalem, Israel." *Id.* ¶ 8 (JA 9). The State Department, however, following its Jerusalem policy set forth in 7 FAM 1383.5-6, issued a passport in Zivotofsky's name listing "Jerusalem" as his place of birth. *Id.*

On September 16, 2003, Zivotofsky, "by his parents and guardians, Ari Z. and Naomi Siegman Zivotofsky," brought suit against the Secretary, seeking, *inter alia*, declaratory relief and a permanent injunction ordering the Secretary to issue him a passport listing "Jerusalem, Israel" as his place of birth. *Id.* at 3 (JA 10).[3] The litigation has been up and down the appellate ladder. First, on September 7, 2004, the district court dismissed the case, concluding that Zivotofsky lacked Article III standing and, alternatively, that the case presented a nonjusticiable political question. *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, No. 03-cv-1921, 2004 WL 5835212 (D.D.C. Sept. 7, 2004). We subsequently reversed and remanded, holding that Zivotofsky had standing.[4] *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 444 F.3d 614 (D.C. Cir. 2006). We noted that Zivotofsky had amended the injunctive relief he initially sought, requesting that the

---

[3] Zivotofsky's complaint alleged that the State Department also improperly recorded his place of birth on his consular report of birth abroad as "Jerusalem." At oral argument, however, Zivotofsky's counsel made clear that he raised no legal argument distinguishing the consular report of birth abroad from the passport. Oral Arg. Tr. 23-24.

[4] We did not reach the political question issue.

Secretary record "Israel" instead of "Jerusalem, Israel" as his place of birth on his passport. *Id.* at 616 n.1. Because "[t]he case . . . no longer involve[d] the claim the district court considered," we "remand[ed] the case to the district court so that both sides may develop a more complete record relating to these and other subjects of dispute." *Id.* at 619-20.

On September 19, 2007, the district court again dismissed the case, once more deciding it presented a nonjusticiable political question. *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 511 F. Supp. 2d 97 (D.D.C. 2007) (*Zivotofsky III*). We affirmed, concluding that "[b]ecause the judiciary has no authority to order the Executive Branch to change the nation's foreign policy in this matter, this case is nonjusticiable under the political question doctrine." *Zivotofsky v. Sec'y of State*, 571 F.3d 1227, 1228 (D.C. Cir. 2009) (*Zivotofsky IV*).[5]

The United States Supreme Court vacated and remanded, holding that the case does not present a political question. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421 (2012) (*Zivotofsky V*). The Court explained that "[t]he federal courts are not being asked to supplant a foreign policy decision of the political branches . . . . [i]nstead, Zivotofsky requests that the courts enforce a specific statutory right." *Id.* at 1427. Given that the parties do not dispute the substance of section 214(d), that is, its requirement that "Israel" be recorded on the passport as the applicant's birthplace at his request, "the only real question for the courts is whether the statute is constitutional," which requires "deciding whether the statute impermissibly intrudes upon Presidential powers under the Constitution." *Id.* at 1427-28. The Court further

---

[5] Senior Judge Edwards concurred, noting that he would have rejected Zivotofsky's claim on the merits. *Zivotofsky IV*, 571 F.3d at 1233-34 (Edwards, J., concurring).

explained that "[r]esolution of Zivotofsky's claim demands careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute and of the passport and recognition powers." *Id.* at 1430.

## II. THE MERITS

Before addressing the merits, we address two preliminary matters. First, Zivotofsky argues that we must " 'not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.' " *United States v. Brinson-Scott*, 714 F.3d 616, 621 (D.C. Cir. 2013) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)). Zivotofsky maintains that we should not reach the Secretary's constitutional defense because section 214(d) constitutes permissible passport legislation. But Zivotofsky's proposed solution—that we hold in effect that the President's constitutional recognition power is not so broad as to encompass section 214(d)—*is* a constitutional holding. We would not avoid "pass[ing] upon a constitutional question" by resolving the case in that manner; instead we would give the President's constitutional power the narrow construction Zivotofsky presses. Moreover, the Supreme Court has specifically instructed us to examine "the textual, structural, and historical evidence . . . regarding the nature . . . of the passport and recognition powers." *Zivotofsky V*, 132 S. Ct. at 1430.

Second, in *Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579 (1952), Justice Jackson set forth a tripartite framework for evaluating the President's powers to act depending on the level of congressional acquiescence. *Id.* at 635 (Jackson, J., concurring); *see also Medellin v. Texas*, 552 U.S. 491, 524 (2008) ("Justice Jackson's familiar tripartite scheme provides the accepted framework for

evaluating executive action in this area."). First, "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635. Second, "[w]hen the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.* at 637. Third, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* Both parties agree that this case falls into category three. In this category the President may nonetheless exercise—and the Congress cannot invade—the President's "exclusive power." *Id.* at 637 n.4. The question here is whether exclusive Executive branch power authorizes the Secretary to decline to enforce section 214(d).

## A.  *The Recognition Power*

Recognition is the act by which "a state commits itself to treat an entity as a state or to treat a regime as the government of a state." RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW § 94(1). "The rights and attributes of sovereignty belong to [a state] independently of all recognition, but it is only after it has been recognized that it is assured of exercising them." 1 John Bassett Moore, *A Digest of International Law* § 27, at 72 (1906) (MOORE'S INT'L LAW DIGEST). Recognition is therefore a critical step in establishing diplomatic relations with the United States; if the United States does not recognize a state, it means the United States is "unwilling[] to acknowledge that the government in question speaks as the sovereign authority for the territory it purports to control."

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964). Recognition also confers other substantial benefits. For example, a recognized sovereign generally may (1) maintain a suit in a United States court, *see id.* at 408-09; *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137 (1938); (2) assert the sovereign immunity defense in a United States court, *see Nat'l City Bank v. Republic of China*, 348 U.S. 356, 359 (1955); and (3) benefit from the "act of state" doctrine, which provides that "[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory," *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303 (1918) (quotation marks omitted).

A government typically recognizes a foreign state by "written or oral declaration." 1 MOORE'S INT'L LAW DIGEST § 27, at 73. Recognition may also be implied as "when a [recognizing] state enters into negotiations with the new state, sends it diplomatic agents, receives such agents officially, gives exequaturs to its consuls, [and] forms with it conventional relations."[6] *Id.*; *see also* David Gray Adler, *The President's Recognition Power*, *reprinted in The Constitution and the Conduct of American Foreign Policy* 133 (David Gray Adler & Larry N. George eds., 1996) ("At international law, the act of receiving an ambassador of a foreign government entails certain legal consequences. The reception of an ambassador constitutes a formal recognition of the sovereignty of the state or government represented.").

---

[6] An exequatur is a "document from the host country [to a foreign consul] that permits the consul to take up consular functions." Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over Foreign Affairs*, 111 YALE L.J. 231, 313 (2001).

As noted earlier, the Supreme Court has directed us to examine the "textual, structural, and historical evidence" the parties have marshaled regarding "the nature . . . of the passport and recognition powers." *Zivotofsky V*, 132 S. Ct. at 1430. We first address the recognition power and, in particular, whether the power is held exclusively by the President.

### B. The President and the Recognition Power

<u>Text and Originalist Evidence</u>

Neither the text of the Constitution nor originalist evidence provides much help in answering the question of the scope of the President's recognition power. In support of his view that the recognition power lies exclusively with the President, the Secretary cites the "receive ambassadors" clause of Article II, Section 3 of the Constitution, which provides, *inter alia*, that the President "shall receive Ambassadors and other public Ministers." U.S. CONST., art II, § 3. But the fact that the President is empowered to receive ambassadors, by itself, does not resolve whether he has the exclusive authority to recognize foreign nations. Some scholars have suggested other constitutional provisions as possible sources of authority for the President to exercise the recognition power but conclude that the text of those provisions does not itself resolve the issue.[7]

---

[7] *See, e.g.*, Reinstein, *supra*, at 809 & n.48, 810-11, 816 (discussing, but finding inconclusive, text of U.S. CONST., art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United States of America."); U.S. CONST., art. II, § 2, cl. 2 (President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors[ and] other public Ministers and Consuls"); U.S. CONST., art. II, § 3 ("[President] shall take Care that the Laws be faithfully executed")

15

Originalist evidence also fails to clarify the Constitution's text. The Federalist Papers contain no mention of the recognition power although Federalist No. 69, written by Alexander Hamilton under the pseudonym "Publius," refers to the "receive ambassadors" clause. Writing in 1788, Hamilton characterized the clause as virtually meaningless:

> [T]hough it has been a rich theme of declamation,[8] [it] is more a matter of dignity than of authority[,] . . . . a circumstance which will be without consequence in the administration of the government; and it was far more convenient that it should be arranged in this manner, than that there should be a necessity of convening the legislature, or one of its branches, upon every arrival of a foreign minister; though it were merely to take the place of a departed predecessor.

Alexander Hamilton, Federalist No. 69, *reprinted in The Federalist* 360 (George W. Carey & James McLellan eds. 2001). The President's power to receive ambassadors may of necessity mean that he has the power not only to "receive" a foreign ambassador but also to decide whether and when to

---

as compared with legislative powers set forth in U.S. CONST., art. I, § 8, cls. 3, 4, 11, 18 ("The Congress shall have Power To . . . regulate Commerce with foreign Nations, . . . establish an uniform Rule of Naturalization, . . . declare War . . . [and] make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers")); *see also* Prakash & Ramsey, *supra*, at 234-35, 253, 316-17 (interpreting Executive Vesting Clause, U.S. CONST., art. II, § 1, cl. 1., and using, *inter alia*, eighteenth-century meaning of executive power).

[8] Scholars, it appears, have been unable to confirm Hamilton's claim that the "receive ambassadors" clause "has been a rich theme of declamation." *See* Reinstein, *supra*, at 845-46.

receive him.[9] In fact, five years after writing Federalist No. 69, Hamilton adopted this interpretation of the "receive ambassadors" clause. In 1793, while serving in President George Washington's cabinet, Hamilton, then writing as "Pacificus," declared that the clause gave the President the power to determine whether the government sending the ambassador should be recognized by the United States. United States National Archives, *Pacificus No. 1* (June 29, 1793), *available at* http://founders.archives.gov/documents/ Hamilton/01-15-02-0038. Hamilton explained that "[t]he Legislative Department is not the *organ* of intercourse between the UStates and foreign Nations. . . . It is therefore not naturally that Organ of the Government which is to pronounce the existing condition of the Nation, with regard to foreign Powers . . . ." *Id.* Rather, "[t]he right of the Executive to receive ambassadors and other public Ministers . . . . includes that of judging, in the case of a Revolution of Government in a foreign Country, whether the new rulers are competent organs of the National Will and ought to be recognised or not." *Id.*

There is little other ratification-era evidence regarding the recognition of foreign governments. In fact, "there is no record that the subject of recognizing foreign states or governments ever came up in the [Constitutional] Convention." Reinstein, *supra*, at 845. One scholar offers two explanations for this gap. First, he suggests that "the founders carefully enumerated the powers of the President and

---

[9] According to the Restatement, when the President receives an ambassador, he recognizes by implication the sovereignty of the sending foreign government. *See, e.g.*, RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 204, Reporters' Note 2 ("Recognition of a state has been effected by . . . receiving the credentials of a diplomatic representative of that state.").

deliberately omitted the recognition power." *Id.* at 860. But if this were the case, it would be unclear which branch, if any, possessed the power. His second explanation is more plausible: "Whether the European nations would accept the United States into their community was of considerable importance to the new nation, but whether the United States would 'recognize' the European nations was a non[ ]sequitur." *Id.* at 861. In other words, the Framers apparently were not concerned with how their young country recognized other nations because the issue was not important to them at the time of ratification.

### Post-ratification History

Both parties make extensive arguments regarding the post-ratification recognition history of the United States. As the Supreme Court has explained, longstanding and consistent post-ratification practice is evidence of constitutional meaning. *See, e.g.*, *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002) ("[A] universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional . . . ." (quotation marks omitted)); *Mistretta v. United States*, 488 U.S. 361, 401 (1989) ("Our 200-year tradition of extrajudicial service is additional evidence that the doctrine of separated powers does not prohibit judicial participation in certain extrajudicial activity."); *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) ("two centuries of national practice," including practice authorized by first Congress, provides "contemporaneous and weighty evidence" of constitutionality (quotation marks omitted)). We conclude that longstanding post-ratification practice supports the Secretary's position that the President exclusively holds the recognition power.

Beginning with the administration of our first President, George Washington, the Executive has believed that it has the exclusive power to recognize foreign nations. In 1793,

President Washington's cabinet unanimously concluded that Washington need not consult with the Congress before receiving the minister from France's post-revolutionary government, notwithstanding his receiving the minister recognized the new government by implication. Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over Foreign Affairs*, 111 YALE L.J. 231, 312 (2001). Nor did the Congress "purport[ ] to tell Washington which countries or governments to recognize." *Id.* at 312-13. The Washington administration also took sole control of issuing exequaturs to foreign consuls. *Id.* at 313 (President Washington "not only signed exequaturs, he also set policy respecting their issuance" (footnote omitted)); *see also* 3 Thomas Jefferson, *Memoir, Correspondence, and Miscellanies from the Papers of Thomas Jefferson* 298 (Thomas Jefferson Randolph ed. 1829) ("[T]he commission of consul to M. Dannery ought to have been addressed to the President of the United States. He being the *only* channel of communication between this country and foreign nations, *it is from him alone* that foreign nations or their agents are to learn what is or has been the will of the nation . . . ." (emphases added)).

In 1817, President James Monroe prevailed in a standoff with Speaker of the House Henry Clay over the recognition power. Clay had announced that he "intended moving the recognition of Buenos Ayres and probably of Chile." Julius Goebel, Jr. *The Recognition Policy of the United States* 121 (1915). But when Clay attempted to amend an appropriations bill to appropriate $18,000 for an American minister to be sent to South America, *id.* at 123-24, he was forced to modify the amendment to manifest that the decision whether to send the minister belonged to the President, *see* 32 ANNALS OF CONGRESS 1498-1500 (1818). And, in fact, even Clay's weakened amendment was defeated in the House; "the reason for the defeat appears to have been that the amendment was interfering with the functions of the executive." Goebel,

*supra*, at 124; *see also* 32 ANNALS OF CONG. 1538 (1818) (statement of Rep. Smith) ("The Constitution has given . . . to the President the direction of our intercourse with foreign nations. It is not wise for us to interfere with his powers . . . ."); *id.* at 1570 (statement of Rep. Smyth) ("[T]he acknowledgement of the independence of a new Power is an exercise of Executive authority; consequently, for Congress to direct the Executive how he shall exercise this power, is an act of usurpation."). According to Goebel, Clay's defeat "meant a great increase of strength for the administration" because "it had received a direct confirmation of its ultimate right to determine whether a government was to be recognized." Goebel, *supra*, at 124.

In 1864 and, again, 1896, the Executive branch challenged the individual houses of the Congress for intruding into the realm of recognition, which eventually led the Congress to refrain from acting. In 1864, the House passed a resolution asserting that it did not acknowledge Archduke Ferdinand Maximilian von Habsburg as the Emperor of Mexico. CONG. GLOBE, 38TH CONG., 1ST SESS. 1408 (1864). The then-Secretary wrote to the United States Minister to France, stating that the recognition authority is "purely executive," belonging "not to the House of Representatives, nor even to Congress, but to the President." *Id.* at 2475. The Senate ultimately did not act on the bill.[10] In 1896, the Senate Foreign Relations Committee presented a joint resolution to

---

[10] The House subsequently passed a resolution that stated, in pertinent part, "Congress has a constitutional right to an authoritative voice in declaring and prescribing the . . . recognition of new Powers as in other matters . . . ." CONG. GLOBE, 38TH CONG., 2D SESS. 65-67 (1864). The Senate never acted on the resolution. Edward S. Corwin, *The President's Control of Foreign Relations* at 42-43 (1917).

the full Senate purporting to recognize Cuba's independence. 29 CONG. REC. 326, 332 (1896). The then-Secretary responded with a statement that the power to "recognize the so-called Republic of Cuba as an independent State rests solely with the Executive"; a joint resolution would have only "advice of great weight." Eugene V. Rostow, *Great Cases Make Bad Law: The War Powers Act*, 50 TEX. L. REV. 866-67 (1972) (quotation marks omitted); *see also* Congress Powerless, N.Y. TIMES, Dec. 19, 1896, *available at* http://query.nytimes.com/mem/archive-free/pdf?res=F10D13F73B5F1B738DDDA90A94DA415B8685F0D3. Again, the Senate did not act on the proposed joint resolution.

In 1919, the Congress once again relented in response to the President's assertion of exclusive recognition power. That year, the Senate considered a resolution which recommended withdrawing recognition of the then-existing Mexican government. PRELIM. REPORT & HR'GS OF THE SEN. COMM. ON FOREIGN RELATIONS, INVESTIGATION OF MEXICAN AFFAIRS, S. DOC. NO. 66-285, at 843D (2d. Sess. 1919-20). In response, President Woodrow Wilson informed the Congress that the resolution, if enacted, would "constitute a reversal of our constitutional practice which might lead to very grave confusion in regard to the guidance of our foreign affairs" because "the initiative in directing the relations of our Government with foreign governments is assigned by the Constitution to the Executive, and to the Executive, only." *Id.* "Within half an hour of the letter's receipt[,] Senator Lodge, Chairman of the Foreign Relations Committee, announced that the [ ] resolution was dead. President Wilson, Mr. Lodge said, must now accept entire responsibility for Mexican relations." Wilson Rebuffs Senate on Mexico, N.Y. TIMES, Dec. 8, 1919, *available at* http://query.nytimes.com/mem/archive-free/pdf?res=9C00E2DD123BEE32A2575AC0A9649D946896D6CF.

Zivotofsky marshals several isolated events in support of his position that the recognition power does not repose solely in the Executive but they are unconvincing. First, Zivotofsky argues that in 1898 the Senate passed a joint resolution stating "the Government of the United States hereby recognizes the Republic of Cuba as the true and lawful Government of that Island." Br. for Appellant 42. But review of the Congressional Record shows that the quoted language was not included in the joint resolution; rather, it was included in a *proposed* joint resolution in the Senate. *See* 31 CONG. REC. 3988 (1898). And the proposed resolution raised separation-of-powers concerns with many Senators. *See id.* at 3990 (statement of Sen. Gorman) ("I regret exceedingly . . . for the first time in the history of the country, this great body should incorporate . . . a power which has been disputed by every Executive from Washington down—the right of Congress by law to provide for the recognition of a state."); *id.* at 3991 (statement of Sen. Allison (calling amendment "contravention of . . . well-settled principles" and Executive "alone can deal with this question in its final aspects"); *id.* at 3991-92 (statement of Sen. Aldrich) ("We have no right at such a time to exercise functions that belong to the Executive."). When the House received the proposed joint resolution, it removed the recognition clause. *See id.* at 4080. The joint resolution, as passed, stated only that "the people" of Cuba were "free and independent." *See* 30 Stat. 738 (Apr. 20, 1898).[11]

Zivotofsky also relies on events that occurred during the administrations of President Andrew Jackson and President

---

[11] The joint resolution provided in full: "Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, First. That the people of the Island of Cuba are, and of right ought to be, free and independent." 30 Stat. 738 (Apr. 20, 1898).

Abraham Lincoln. In both instances, however, the Congress did not attempt to exercise the recognition power. Instead, it authorized appropriations to be used by the President to dispatch diplomatic representatives. In 1836, President Jackson expressed a desire to "unite" with the Congress before recognizing Texas as independent from Mexico. MESSAGE FROM THE PRESIDENT OF THE UNITED STATES UPON THE SUBJECT OF THE POLITICAL, MILITARY, AND CIVIL CONDITION OF TEXAS, H.R. DOC. NO. 24-35, at 4 (2d Sess. 1836). But in doing so, Jackson did not suggest that he lacked the exclusive recognition power. *See id.* at 2 ("[O]n the ground of expediency, I am disposed to concur, and do not, therefore, consider it necessary to express any opinion as to the strict constitutional right of the Executive, either apart from or in conjunction with the Senate, over the subject."). Rather, Jackson merely enlisted the support of the Congress as a matter of political prudence. In any event, the Congress did not attempt to exercise the recognition power on its own. Instead, the Congress appropriated funds for the President to authorize a "diplomatic agent to be sent to the Republic of Texas, whenever the President of the United States . . . shall deem it expedient to appoint such minister." 5 Stat. 107 (1837). Similarly, President Lincoln expressed a desire to coordinate with the Congress by requesting that it use its appropriations authority to endorse his recognition of Liberia and Haiti. *See* Lincoln's First Annual Message to Congress (Dec. 3, 1861), *available at* http://www.presidency.ucsb.edu/ ws/?pid=29502. And the Congress subsequently did so. 12 Stat. 421.[12]

---

[12] Zivotofsky also calls our attention to the recognition of Hungary during President Zachary Taylor's administration. The Secretary wrote to the President's appointed minister to Hungary: "Should the new government prove to be, in your opinion, firm and

<u>Supreme Court Precedent</u>

It is undisputed that "in the foreign affairs arena, the

---

stable, the President will cheerfully recommend to Congress, at their next session, the recognition of Hungary." Letter from Clayton to Mann (June 18, 1849), *reprinted in* 1 MOORE'S INT'L L. DIGEST § 75, at 246. Zivotofsky argues that the letter manifests Taylor's uncertainty regarding his exclusive recognition authority. But another communication from President Taylor made clear that he understood that he was authorized to recognize Hungary without the Congress. *See* 5 A Compilation of the Messages and Papers of the Presidents, 1789-1897 at 12 (James D. Richardson ed. 1897) (State of the Union address) ("I thought it my duty, in accordance with the general sentiment of the American people, . . . to stand prepared, upon the contingency of the establishment by her of a permanent government, to be the first to welcome independent Hungary into the family of nations. For this purpose *I invested an agent then in Europe with power to declare our willingness promptly to recognize her independence in event of her ability to sustain it.*" (emphasis added)). Whatever Taylor's uncertainty, it sounds alone in stark contrast to otherwise seamless post-ratification history.

In addition, Amicus American Jewish Committee supplies other examples of Presidential enlistment of the Congress's support. *See, e.g.*, Am. Jewish Committee Amicus Br. at 9-10 (Washington considered removing diplomatic authority of France's minister and instructed Thomas Jefferson to draft message stating he intended to remove Genet's diplomatic authority unless either house objected). None of them acknowledge either expressly or by implication that the recognition power was one shared, under the Constitution, with the Congress. We are also unpersuaded by amicus's citation to Secretary of State James Buchanan's observation that "recognition is usually effected, either by a nomination to, and confirmation by the Senate of a Diplomatic or Consular agent to the new Government, or by an act of Congress." 1 MOORE'S INT'L L. DIGEST § 75, at 245-46.

President has 'a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.' " *Clinton v. City of New York*, 524 U.S. 417, 445 (1998) (quoting *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936)). While the President's foreign affairs powers are not precisely defined, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634-35 (1952) (Jackson, J., concurring), the courts have long recognized the President's presumptive dominance in matters abroad. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) ("[O]ur cases have recognized that the President has authority to make 'executive agreements' with other countries, requiring no ratification by the Senate or approval by Congress, this power having been exercised since the early years of the Republic."); *Youngstown*, 343 U.S. at 610 (President has "vast share of responsibility for the conduct of our foreign relations") (Frankfurter, J., concurring); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) ("President is exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) ("[C]ourts have been wary of second-guessing executive branch decision[s] involving complicated foreign policy matters."). Thus, the Court, echoing the words of then-Congressman John Marshall, has described the President as the "sole organ of the nation in its external relations, and its sole representative with foreign nations." *Curtiss-Wright*, 299 U.S. at 319 (quoting 10 ANNALS OF CONG. 613 (Mar. 7, 1800)).

The Supreme Court has more than once declared that the recognition power lies exclusively with the President. *See Williams v. Suffolk Ins. Co.*, 38 U.S. 415, 420 (1839) ("[If] the executive branch . . . assume[s] a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department[.]"); *United States v. Belmont*, 301 U.S.

324, 330 (1937) ("[T]he Executive had authority to speak as the sole organ of th[e] government" in matters of "recognition, establishment of diplomatic relations, the assignment, and agreements with respect thereto . . . ."); *Guaranty Trust Co. v. United States*, 304 U.S. 126, 138 (1938) ("We accept as conclusive here the determination of our own State Department that the Russian State was represented by the Provisional Government . . . ."); *United States v. Pink*, 315 U.S. 203, 229 (1942) ("The powers of the President in the conduct of foreign relations included the power, without consent of the Senate, to determine the public policy of the United States with respect to the Russian nationalization decrees. . . . [including t]h[e] authority . . . [to determine] the government to be recognized."); *Baker v. Carr*, 369 U.S. 186, 213 (1962) ("[I]t is the executive that determines a person's status as representative of a foreign government."); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition is exclusively a function of the Executive."). To be sure, the Court has not *held* that the President exclusively holds the power. But, for us—an inferior court—"carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative," *United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) (quotation marks omitted); *see also Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.), especially if the Supreme Court has repeated the dictum, *see Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1295 (D.C. Cir. 2010) (Supreme Court dictum is "especially" authoritative  if "the Supreme Court has reiterated the same teaching").

In *Williams v. Suffolk Insurance Company*, the issue before the Court was whether "the Falkland islands . . . constitute any part of the dominions within the sovereignty of the government of Buenos Ayres." 38 U.S. at 419. The Court

decided that the President's action in the matter was "conclusive on the judicial department." *Id.* at 420.

> And can there be any doubt, that when the executive branch of the government, which is charged with our foreign relations, shall in its correspondence with a foreign nation assume a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department? And in this view it is not material to inquire, nor is it the province of the Court to determine, whether the executive be right or wrong. It is enough to know, that in the exercise of his constitutional functions, he has decided the question. Having done this under the responsibilities which belong to him, it is obligatory on the people and government of the Union.

*Id.* Similarly, in *Banco Nacional de Cuba v. Sabbatino*, without determining whether the United States had de-recognized Cuba's government under Fidel Castro, the Court explained that "[p]olitical recognition is exclusively a function of the Executive." 376 U.S. at 410. The Court emphasized that were it to decide for itself whether Cuba had been de-recognized, there would be a real "possibility of embarrassment to the Executive Branch in handling foreign relations." *Id.* at 412.

President Franklin D. Roosevelt's 1933 recognition of the Soviet Union led to three cases supporting the conclusion that the President exclusively holds the recognition power. *Belmont*, 301 U.S. 324; *Guaranty Trust*, 304 U.S. 126; *Pink*, 315 U.S. 203. On November 16, 1933, the United States recognized the Soviet Union as the government of Russia "and as an incident to that recognition accepted an assignment (known as the Litvinov Assignment) of certain claims." *Pink*, 315 U.S. at 211. Under the Litvinov Assignment, the Soviet Union agreed to "take no steps to enforce claims against

American nationals; but all such claims were released and assigned to the United States." *Belmont*, 301 U.S. at 326. When the United States sought to collect on the assigned claims, its action spawned litigation resulting in the three cases.

In *Belmont*, the Court held that New York State's conflicting public policy did not prevent the United States from collecting assets assigned by the Litvinov Assignment. *Id.* at 330. It noted that "who is the sovereign of a territory is not a judicial question, but one the determination of which by the *political departments* conclusively binds the courts." *Id.* at 328 (emphasis added). But the Court then more specifically explained that "recognition, establishment of diplomatic relations, the assignment, and agreements with respect thereto, were all parts of one transaction" and plainly "within the competence *of the President*." *Id.* at 330 (emphasis added). Moreover, "in respect of what was done here, the *Executive had authority to speak as the sole organ of that government*. The assignment and the agreements in connection therewith *did not, as in the case of treaties, . . . require the advice and consent of the Senate*." *Id.* (emphases added). In other words, the Court not only emphasized the President's exclusive recognition power but also distinguished it from the *shared* treaty power.

In *Guaranty Trust*, the Court held that a United States claim for payment of funds held in a bank account formerly owned by Russia was barred by New York State's statute of limitations. 304 U.S. at 130, 143-44. In so doing, it relied on the Executive branch's recognition determination: which "government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government. . . . We accept as conclusive here *the determination of our own State Department* that the Russian

State was represented by the Provisional Government." *Id.* at 137-38 (emphasis added).

Finally, the Supreme Court in *Pink*, following *Belmont*, held that New York State could not "deny enforcement of a claim under the Litvinov Assignment because of an overriding [state] policy." *Pink*, 315 U.S. at 222. The Court defined the recognition power broadly and placed it in the hands of the President:

> The *powers of the President* in the conduct of foreign relations included the power, *without consent of the Senate*, to determine the public policy of the United States with respect to the Russian nationalization decrees. . . . That authority is not limited to a determination of the government to be recognized. It *includes the power to determine the policy which is to govern the question of recognition*. Objections to the underlying policy as well as objections to recognition are to be addressed to the political department and not to the courts. . . .

*Id.* at 229 (citations omitted and emphases added).

The Court also treated the recognition power as belonging exclusively to the Executive in *Baker v. Carr*. It explained that "recognition of [a] foreign government[] so strongly defies judicial treatment that without *executive recognition* a foreign state has been called a republic of whose existence we know nothing." 369 U.S. at 212 (quotation marks and footnote omitted). The Court further explained that "the judiciary *ordinarily follows the executive* as to which nation has sovereignty over disputed territory" and that "it is *the executive* that determines a person's status as representative of a foreign government." *Id.* at 212-13 (emphases added).

Zivotofsky relies on *United States v. Palmer*, 16 U.S. 610 (1818), where the Court stated that "the courts of the union must view [a] newly constituted government as it is viewed by the legislative and executive departments of the government of the United States." *See id.* at 643. But this observation simply means that the judiciary will not decide the question of recognition. When the High Court has discussed the recognition power with more specificity, as it did in the above-cited cases, it has not merely stated that the judiciary lacks authority to decide the issue but instead has explained that the President has the *exclusive* authority. In addition, Zivotofsky's reliance on *Cherokee Nation v. Georgia*, 30 U.S. 1 (1831), is misplaced as the case dealt with the recognition of Indian tribes which, the *Cherokee Nation* opinion itself explains, are materially distinct from foreign nations. *See id.* at 18 (Marshall, C.J.); *see also Miami Nation of Ind., Inc. v. U.S. Dep't of the Interior*, 255 F.3d 342, 345 (7th Cir. 2001) ("Indian tribes are not foreign [states] . . . .").[13]

---

[13] Zivotofsky also cites three other cases he contends indicate the recognition power lies with both "political departments." They include: "*Boumediene v. Bush*, 553 U.S. 723, 753 (2008) ('[T]he Court has held that questions of sovereignty are for *the political branches* to decide.'); *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380 (1948) ('[T]he determination of sovereignty over an area is for *the legislative and executive departments* . . . .'); [and] *Jones v. United States*, 137 U.S. 202, 214 (1890) ('[A]ll courts of justice are bound to take judicial notice of the territorial extent of the jurisdiction exercised by the government whose laws they administer, or of its recognition or denial of the sovereignty of a foreign power, as appearing from the public acts *of the legislature and executive* . . . .')." Br. for Appellant 43 (emphases in brief). But *Boumediene*, *Vermilya-Brown* and *Jones* do not involve the recognition of a foreign power; rather, they relate to the authority of

Having reviewed the Constitution's text and structure, Supreme Court precedent and longstanding post-ratification history, we conclude that the President exclusively holds the power to determine whether to recognize a foreign sovereign.[14]

---

the United States over a given territory. Because the Congress has the enumerated constitutional power to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," U.S. CONST., art. IV, § 3, cl. 2, the three cases are distinguishable.

[14] Zivotofsky points to early legal scholarship, including a treatise written by William Rawle: "The legislature indeed possesses a superior power, and may declare its dissent from the executive recognition or refusal, but until that sense is declared, the act of the executive is binding." William Rawle, *A View of the Constitution of the United States of America* 195-96 (Philip H. Nicklin 2d ed. 1829). In 1833, Justice Joseph Story wrote that the recognition question was an "abstract statement[ ] under the constitution" that was "still open to discussion." 2 Joseph Story, *Commentaries on the Constitution of the United States* § 1566 (Little & Brown 2d ed. 1851). Moreover, while "[t]he constitution has expressly invested the executive with power to receive ambassadors, and other ministers[ i]t has not expressly invested congress with the power, either to repudiate, or acknowledge them." *Id.* at 359 (emphasis added). Subsequently, while sitting as a Circuit Justice, Justice Story wrote that "[i]t is very clear, that it belongs exclusively to the executive department of our government to recognize, from time to time, any new governments, which may arise in the political revolutions of the world . . . ." *Williams v. Suffolk Ins. Co.*, 29 F. Cas. 1402, 1403 (C.C.D. Mass. 1838).

### *C.  Section 214(d) and the "Passport Power" vis-à-vis the Recognition Power*

Having concluded that the President exclusively holds the recognition power, we turn to the "passport power," pursuant to which section 214(d) is alleged to have been enacted. We must decide whether the Congress validly exercised its passport power in enacting section 214(d) or whether section 214(d) "impermissibly intrudes" on the President's exclusive recognition power. *Zivotofsky V*, 132 S. Ct. at 1428.

Zivotofsky first contends that section 214(d) is a permissible exercise of the Congress's "passport power." In its remand to us, the Supreme Court directed that we examine, *inter alia*, the parties' evidence regarding "the nature of . . . the passport . . . power[ ]." *Id.* at 1430. Neither party has made clear the textual source of the passport power in the Constitution, suggesting that it may come from the Congress's power regarding immigration and foreign commerce. *See, e.g.*, Oral Arg. Tr. 48-49 (Zivotofsky's counsel noting "there's no specific power in the Constitution that says passports" and referencing the Congress's authority "over immigration[ and] over international commerce"); Br. for Appellee 45 (citing U.S. CONST., art. I, § 8, cls. 3, 4). Nonetheless, it is clear that the Congress has exercised its legislative power to address the subject of passports. It does not, however, have exclusive control over all passport matters. Rather, the Executive branch has long been involved in exercising the passport power, especially if foreign policy is implicated. *See Haig v. Agee*, 453 U.S. 280 (1981). Until 1856, no passport statute existed and so "the common perception was that the issuance of a passport was committed to the sole discretion of the Executive and that the Executive would exercise this power in the interests of the national security and foreign policy of the United States." *Id.* at 293. After the first passport law was enacted in 1856, "[t]he

President and the Secretary of State consistently construed the 1856 Act to preserve their authority to withhold passports on national security and foreign policy grounds." *Id.* at 295. And once the Congress enacted the Passport Act of 1926, each successive President interpreted the Act to give him the authority to control the issuance of passports for national security or foreign policy reasons: "Indeed, by an unbroken line of Executive Orders, regulations, instructions to consular officials, and notices to passport holders, the President and the Department of State left no doubt that *likelihood of damage to national security or foreign policy of the United States was the single most important criterion in passport decisions.*" *Id.* at 298 (footnotes omitted and emphasis added); *see also* 16 U.S. Op. Off. Legal Counsel 18, 23 (1992) ("Executive action to control the issuance of passports in connection with foreign affairs has never been seriously questioned.").

Zivotofsky relies on Supreme Court precedent that, he contends, shows the Executive cannot regulate passports unless the Congress has authorized him to do so. In both cases cited, the Court held that the Executive branch acted properly once the Congress had authorized it to so act. *See Haig*, 453 U.S. at 282, 289, 309 (upholding Executive authority to revoke passport on national security and foreign policy grounds after concluding revocation was authorized by Congress); *Zemel v. Rusk*, 381 U.S. 1, 8 (1965) (upholding State Department's refusal to validate passport for travel to Cuba because "the Passport Act of 1926 embodie[d] a grant of authority to the Executive" (citation omitted)). But in neither case did the Court state that the Congress's power over passports was exclusive. Indeed, in *Haig*, the Court made clear that it did *not* decide that issue. *Haig*, 453 U.S. at 289 n.17 ("In light of our decision on this issue, we have no occasion in this case to determine the scope of the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of

international relations—a power which does not require as a basis for its exercise an act of Congress . . . ." (quotation marks omitted)). Likewise, in *Zemel*, the Court in effect rejected the dissenters' statements implying that the Congress exclusively regulates passports. 381 U.S. at 21 (Black, J., dissenting) ("[R]egulation of passports . . . is a law-making— not an executive, law-enforcing—function . . . ."); *id.* at 29 (Goldberg, J., dissenting) (Executive lacks "an inherent power to prohibit or impede travel by restricting the issuance of passports"). Instead, the Court emphasized that the "Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Id.* at 17.[15]

---

[15] Amicus Members of the United States Senate and the United States House of Representatives rely on the holding in *Kent v. Dulles*, 357 U.S. 116 (1958). In *Kent*, two citizens successfully challenged the Secretary's denial of their passports—on the ground that they refused to state whether they were communists—arguing that, *inter alia*, the denial violated their Fifth Amendment due process right of travel. *Id.* at 117-20, 125. But *Kent* held, at most, that absent congressional authorization, the State Department could not *deny* a passport if the denial violated a *constitutional* right. *See id.* at 129 ("If [constitutional] liberty is to be regulated, it must be pursuant to the lawmaking functions of the Congress." (quotation marks omitted)). Here, the State Department has not *denied* Zivotofsky a passport nor does Zivotofsky assert the violation of a *constitutional* right. Moreover, the Court itself has not treated *Kent* as if it held that the Executive's regulation of passports is entirely dependent on congressional authorization. *See Haig*, 453 U.S. at 289 n.17. For example, in *Zemel*, the Court distinguished *Kent* on the basis that *Kent* had invalidated the State Department's denial "based on the character of the particular applicant." 381 U.S. at 13. In contrast, the denial that *Zemel* upheld was based on "foreign policy considerations affecting all citizens"—namely, avoiding the

Thus, while the Congress has the power to enact passport legislation, its passport power is not exclusive. And if the Congress legislates pursuant to its non-exclusive passport power in such a way to infringe on Executive authority, the legislation presents a separation of powers problem. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010) (Sarbanes-Oxley Act's dual for-cause limitations on removal of members of financial oversight board unconstitutional on separation of powers ground); *Bowsher v. Synar*, 478 U.S. 714, 769 (1986) ("[E]ven the results of the constitutional legislative process may be unconstitutional if those results are in fact destructive of the scheme of separation-of-powers.").

The question we must answer, then, is whether section 214(d)—which speaks only to passports—nonetheless interferes with the President's exclusive recognition power. Zivotofsky contends that section 214(d) causes no such interference because of its limited reach, that is, it simply regulates one detail of one limited type of passport. But the President's recognition power "is not limited to a determination of the government to be recognized"; it also "includes the power to determine the policy which is to govern the question of recognition." *Pink*, 315 U.S. at 229. Applying this rule, the *Pink* Court held that New York State policy was superseded by the Litvinov Assignment when the policy—which declined to give effect to claims under the Litvinov Assignment—"collid[ed] with and subtract[ed] from the [President's recognition] policy" by "tend[ing] to restore some of the precise impediments to friendly relations which the President intended to remove" with his recognition policy. *Id.* at 231.

---

danger that travel to Cuba by United States citizens "might involve the Nation in dangerous international incidents." *Id.* at 13, 15.

With the recognition power overlay, section 214(d) is not, as Zivotofsky asserts, legislation that simply—and neutrally—regulates the form and content of a passport. Instead, as the Secretary explains, it runs headlong into a carefully calibrated and longstanding Executive branch policy of neutrality toward Jerusalem. Since 1948, American presidents have steadfastly declined to recognize any foreign nation's sovereignty over that city. The Executive branch has made clear that the status of Jerusalem must be decided not unilaterally by the United States but in the context of a settlement involving all of the relevant parties. *See supra* pp. 1-2. The State Department FAM implements the Executive branch policy of neutrality by designating how a Jerusalem-born citizen's passport notes his place of birth. For an applicant like Zivotofsky, who was born in Jerusalem after 1948, the FAM is emphatic: denote the place of birth as "Jerusalem." 7 FAM 1383.5-6 (JA 115); *see also* 7 FAM 1383 Ex. 1383.1 pt. II (JA 127) (stating that "Israel" "[d]oes not include Jerusalem" and that for applicants born in "Jerusalem," "[d]o not write Israel or Jordan"). In his interrogatory responses, the Secretary explained the significance of the FAM's Jerusalem directive: "Any unilateral action by the United States that would signal, symbolically or concretely, that it recognizes that Jerusalem is a city that is located within the sovereign territory of Israel would critically compromise the ability of the United States to work with Israelis, Palestinians and others in the region to further the peace process." Def.'s Resps. to Pl.'s Interrogs. at 8-9, *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, No. 03-cv-1921 (D.D.C. June 5, 2006) (JA 58-59). Furthermore, "[t]he Palestinians would view any United States change with respect to Jerusalem as an *endorsement of Israel's claim to Jerusalem* and a rejection of their own." *Id.* at 9 (JA 59) (emphasis added). Thus, "[w]ithin the framework of this highly sensitive, and potentially volatile, mix of political,

juridical, and religious considerations, U.S. Presidents have consistently endeavored to maintain a strict policy of not prejudging the Jerusalem status issue and thus not engaging in official actions that *would recognize, or might be perceived as constituting recognition of*, Jerusalem as either the capital city of Israel, or as a city located within the sovereign territory of Israel." *Id.* (emphasis added). "[R]eversal of United States policy not to prejudge a central final status issue could provoke uproar throughout the Arab and Muslim world and seriously damage our relations with friendly Arab and Islamic governments, adversely affecting relations on a range of bilateral issues, including trade and treatment of Americans abroad." *Id.* at 11 (JA 61). We find the Secretary's detailed explanation of the conflict between section 214(d) and Executive recognition policy compelling, especially given "our customary policy to accord deference to the President in matters of foreign affairs." *Ameziane v. Obama*, 699 F.3d 488, 494 (D.C. Cir. 2012) (quotation marks omitted); *see also Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 348 (2005) (noting "our customary policy of deference to the President in matters of foreign affairs" that "may implicate our relations with foreign powers . . . requir[ing] consideration of changing political and economic circumstances" (quotation marks omitted)); *Rattigan v. Holder*, 689 F.3d 764, 769 (D.C. Cir. 2012) (finding "the government's arguments quite powerful, especially given the deference owed the executive in cases implicating national security" (quotation marks omitted)). By attempting to alter the State Department's treatment of passport applicants born in Jerusalem, section 214(d) directly contradicts a carefully considered exercise of the Executive branch's recognition power.

Our reading of section 214(d) as an attempted legislative articulation of foreign policy is consistent with the Congress' characterization of the legislation. By its own terms, section

214 was enacted to alter United States foreign policy toward Jerusalem. The title of section 214 is "*United States Policy* with Respect to Jerusalem as the Capital of Israel." Pub. L. No. 107-228 § 214, 116 Stat. at 1365 (emphasis added). Section 214(a) explains that "[t]he Congress maintains its commitment to relocating the United States Embassy in Israel to Jerusalem and urges the President . . . to immediately begin the process of relocating the United States Embassy in Israel to Jerusalem." *Id.* § 214(a), 116 Stat. at 1365-66. The House Conference report accompanying the bill that became the Foreign Relations Authorization Act explained that section 214 "contain[ed] four provisions related to the recognition of Jerusalem as Israel's capital." H.R. Conf. Rep. 107-671 at 123 (Sept. 23, 2002). Various members of the Congress explained that the purpose of section 214(d) was to affect United States policy toward Jerusalem and Israel. *See* 148 CONG. REC. H6,649, H6,649 (daily ed. Sept. 25, 2002) (statement of Rep. Diaz-Balart) ("This legislation requires compliance with [the Jerusalem Embassy Act[16]] that recognizes Jerusalem as the capital of Israel . . . ."); *id.* at H6,653 (statement of Rep. Hyde) ("[The bill] contains provisions to spur compliance with [the Jerusalem Embassy Act] recognizing Jerusalem as the capital of Israel."); *id.* (statement of Rep. Lantos) ("Our bill reaffirms United States policy that Jerusalem is the undivided and eternal capital of the State of Israel."); 148 CONG. REC. S9,401-02, S9,403 (daily ed. Sept. 26, 2002) (statement of Sen. Helms) ("This bill . . . . recognize[s] the right of Israel to name Jerusalem as its own capit[a]l . . . .").

Moreover, as the Secretary averred earlier in this litigation, the 2002 enactment of section 214 "provoked strong reaction throughout the Middle East, even though the

---

[16] The Jerusalem Embassy Act is discussed *supra* at pp. 3-4.

President in his signing statement said that the provision would not be construed as mandatory and assured that 'U.S. policy regarding Jerusalem has not changed.' " Def.'s Resps. to Pl.'s Interrogs. at 9-10, *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, No. 03-cv-1921 (D.D.C. June 5, 2006) (JA 59-60). For example, various Palestinian groups issued statements asserting that section 214 "undermine[d] the role of the U.S. as a sponsor of the peace process," "undervalu[ed] . . . Palestinian, Arab and Islamic rights in Jerusalem" and "rais[ed] questions about the real position of the U.S. Administration vis-à-vis Jerusalem." *Id.* at 10 (JA 60) (quotation marks omitted). As in *Pink*, the Secretary's enforcement of section 214(d) "would collide with and subtract from the [President's] policy" by "help[ing] keep alive one source of friction" between the United States and parties in conflict in the Middle East "which the policy of recognition was designed to eliminate." *Pink*, 315 U.S. at 231-32.[17]

Zivotofsky argues that the Secretary has not suffered—and will not suffer—adverse foreign policy consequences by issuing him a passport that lists his place of birth as Israel. He asserts that the Secretary has admitted that, from time to time, the State Department has inadvertently issued passports with "Israel" as the place of birth to citizens born in Jerusalem and that there is no evidence that the issuance of the passports

---

[17] Unlike in *Pink*, here the legislation that conflicts with the President's recognition power was enacted by the Congress, not a state. But, as we today hold, the President exclusively exercises the recognition power. The Congress, like a state, may not impermissibly intrude on an *exclusive* Executive power. Contrary to Zivotofsky's assertion, then, the fact that the Congress, rather than a state legislature, enacted section 214(d) does not distinguish this case from *Pink*.

resulted in harm to the United States's foreign policy interests. Similarly, Zivotofsky cites State Department records that, before revision, referred to "Jerusalem, Israel." Br. for Appellant 14. Likewise, Amicus Zionist Organization of America exhaustively catalogues official United States websites that contained "Jerusalem, Israel" before recent revisions. Zivotofsky further notes that "not a single Palestinian or Arab interest group deemed it important enough to submit an *amicus curiae* brief in the Supreme Court contending that section 214(d) should not be enforced" nor has any such group appeared in our court during this lengthy litigation. Appellant's Reply Br. 3. Zivotofsky also contends that the Secretary's fear of harm is exaggerated because section 214(d)'s passport directive is not unlike its Taiwan directive that allows an applicant born in Taiwan to specify as his birthplace "Taiwan" rather than "China," which directive has been peacefully implemented. Br. for Appellant 54-56.[18]

Nonetheless, we are not equipped to second-guess the Executive regarding the foreign policy consequences of section 214(d). *See, e.g.*, *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial . . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry."); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) ("[F]oreign policy [is] the province and responsibility of the Executive.")

---

[18] The State Department included "Taiwan" on passports only after determining that doing so was consistent with United States policy that Taiwan is a part of China; by contrast, section 214(d) is inconsistent with the United States's policy of neutrality regarding Jerusalem.

(quotation marks omitted); *Haig*, 453 U.S. at 292 ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."). As the Executive—the "sole organ of the nation in its external relations," *Curtiss-Wright*, 299 U.S. at 319—is the one branch of the federal government before us[19] and both the current Executive branch as well as its predecessor believe that section 214(d) would cause adverse foreign policy consequences (and in fact presented evidence that it had caused foreign policy consequences), that view is conclusive on us. *Cf. United States v. Nixon*, 418 U.S. 683, 710 (1974) ("[T]he courts have traditionally shown the utmost deference to Presidential responsibilities . . . . involving foreign policy considerations . . . ."). Moreover, Zivotofsky's reliance on the State Department's earlier, incidental references to "Jerusalem, Israel" or inclusion of "Israel" on the passports of United States citizens born in Jerusalem is entirely misplaced. The controversy does not arise because a website or passport at one time included a reference connecting Jerusalem and Israel. Rather, the unconstitutional intrusion results from section 214(d)'s attempted alteration of United States policy to require the State Department to take an *official and intentional action* to include "Israel" on the passport of a United States citizen born in Jerusalem. While the fact that legislation merely touches on a policy relating to recognition does not make it unconstitutional, section 214(d) does not do so; instead the Congress plainly intended to force the State Department to deviate from its decades-long position of neutrality on what nation or government, if any, is sovereign over Jerusalem. Accordingly, we conclude that section 214(d)

---

[19] While an amicus brief has been submitted on behalf of six senators and fifty-seven representatives, they of course do not speak for the Congress *qua* the Congress.

impermissibly intrudes on the President's recognition power and is therefore unconstitutional.

## D. Zivotofsky's Remaining Arguments

Zivotofsky challenges the Secretary's decision declining to enforce section 214(d) on two additional grounds but we find both grounds without merit.

First, Zivotofsky contends that section 214(d) remedies the State Department's discriminatory policy against supporters of Israel. He notes that an individual born in Tel Aviv or Haifa after 1948 may list as his place of birth either "Israel" or his local birthplace if he objects to including "Israel." *See* 7 FAM 1383.5-4 (JA 114). An individual born in Jerusalem after 1948, as we have discussed, may not choose between a country and a locality; rather, his place of birth must be listed as "Jerusalem." *See* 7 FAM 1383.5-6 (JA 115). Zivotofsky laments that "[n]o matter where in Jerusalem an American citizen may be born . . . he or she does not have the option given to American citizens born in Tel Aviv or Haifa to choose whether to record the country or city of birth." Br. for Appellant 57. We do not decide the merits of this contention because Zivotofsky did not make it in district court and it is therefore waived. *See, e.g.*, *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1117 (D.C. Cir. 2010).

Second, Zivotofsky argues that President George W. Bush's signing statement—indicating that section 214 is, in his view, unconstitutional—is invalid because he should have instead vetoed the enactment to register his objection. The signing statement is irrelevant. Even if the signing statement were before us and we were somehow to find it wanting, that conclusion would have no effect on the Secretary's enforcement of section 214(d) today.

42

\* \* \* \*

For the foregoing reasons, we affirm the judgment of the district court dismissing the complaint on the alternative ground that section 214(d) impermissibly infringes on the President's exercise of the recognition power reposing exclusively in him under the Constitution and is therefore unconstitutional.[20]

*So ordered.*

---

[20] The district court dismissed Zivotofsky's complaint on the ground that it presented a nonjusticiable political question. *Zivotofsky III*, 511 F. Supp. 2d at 99. While the district court did not reach the merits, we need not remand because no factual development is necessary to decide the case. *See, e.g.*, *Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 938 (D.C. Cir. 2012).

TATEL, *Circuit Judge*, concurring: Although I concur fully in the court's opinion, I write separately to elucidate my thinking about the important and novel separation-of-powers question this case presents. The Secretary's argument that Section 214(d) is unconstitutional turns on two subsidiary arguments: first, that the power to recognize foreign sovereigns belongs to the President alone; and second, that Section 214(d) interferes with the President's exclusive exercise of that power. But I think it best to begin with an issue that underlies and helps frame these recognition power questions, namely, Congress's so-called passport power.

## I.

It is beyond dispute that Congress's immigration, foreign commerce, and naturalization powers authorize it to regulate passports. *See* Court's Op. at 31–34; Secretary's Br. at 45–46 (acknowledging that "Congress . . . has the constitutional authority to generally regulate the form and content of passports in furtherance of its enumerated powers"). Zivotofsky would have us stop there. He reasons that because Congress has the power to regulate passports and because Section 214(d) is passport legislation, the statute is constitutional. This argument, however, overlooks the independent limitations the Constitution imposes even on legislation within Congress's enumerated powers. That is, a statute that Congress would otherwise have authority to enact may still run up against some independent restriction on its power. For example, the Commerce Clause authorizes Congress to regulate interstate communications, but a communications statute may nevertheless run afoul of the First Amendment. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844 (1997) (holding that anti-indecency provisions of the Communications Decency Act violated the First Amendment).

The fact that Congress has affirmative authority to regulate passports thus does not resolve the question of whether Section 214(d) comports with the separation of powers. It does,

however, help frame the quite narrow constitutional question we must answer. Congress has authority to regulate passports; we need only decide whether this particular exercise of that authority, Section 214(d), infringes on the Executive's recognition power.

## II.

As I noted at the outset, in order to demonstrate that Section 214(d) is unconstitutional the Secretary must begin by establishing that the recognition power in fact inheres exclusively in the President. This is because, as the court explains, *see* Court's Op. at 11–12, a President may "take[ ] measures incompatible with the expressed . . . will of Congress" only when he acts pursuant to an "exclusive" Executive power. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 & n.4 (1952) (Jackson, J., concurring). If the Constitution entrusts the recognition power exclusively to the President, as the Secretary claims, there remains the even more difficult question of whether Section 214(d) intrudes upon his exercise of that power. In resolving both questions, we find ourselves in relatively uncharted waters with few fixed stars by which to navigate.

## A.

I have little to add to the court's thorough discussion of whether the Constitution endows the President with exclusive power to recognize foreign sovereigns. As the court details, there is scant constitutional text to guide us and little contemporaneous evidence of the Framers' intent. *See* Court's Op. at 14–17. Moreover, although the court thoroughly recounts the historical precedents each side marshals in support of its position, *see id.* at 17–22, the most striking thing about this retelling is what is absent from it: a situation like this one, where the President and Congress disagree about a recognition

question. To be sure, throughout our history Congress has often acquiesced in a President's unilateral recognition of a foreign sovereign. *See, e.g.*, *id.* at 17–18 (detailing President George Washington's recognition of France's post-revolutionary government). And on a few occasions, a President has voluntarily coordinated with Congress regarding a recognition decision. *See, e.g.*, *id.* at 21–22 (pointing to President Abraham Lincoln's request that Congress endorse his recognition of Liberia and Haiti). But neither party (nor any of the amici) points to any time in our history when the President and Congress have clashed over an issue of recognition.

Given all that, it is unsurprising that the Supreme Court has had no occasion to definitively resolve the political branches' competing claims to recognition power. True, the Court has consistently and clearly stated that *courts* have no authority to second-guess recognition decisions. *See, e.g.*, *Williams v. Suffolk Insurance Co.*, 38 U.S. 415, 420 (1839). And in so doing, it has often referred to the recognition power as inhering exclusively in the Executive. *See, e.g.*, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition is exclusively a function of the Executive."). That said, the Court has also occasionally suggested that Congress and the President share that power. *See, e.g. Jones v. United States*, 137 U.S. 202, 212 (1890) ("Who is the sovereign . . . of a territory, is not a judicial, but a political, question, the determination of which by the legislative and executive departments . . . conclusively binds the judges . . . ."). Significantly for our purposes, the Court has made many more statements falling in the former category than in the latter. But still and again, the Court has never squarely resolved the precise question we face today.

To say that the question has yet to be conclusively answered, however, is not to say—at least from the

perspective of this "inferior" court—that the answer is unclear. All told, given the great weight of historical and legal precedent and given that "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative," *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) (internal quotation marks omitted), we are compelled to conclude that "[p]olitical recognition is exclusively a function of the Executive," *Sabbatino*, 376 U.S. at 410. Indeed, all three of our colleagues who considered this question the last time this case was before us agreed. *See Zivotofsky v. Secretary of State*, 571 F.3d 1227, 1231 (D.C. Cir. 2009), vacated and remanded by *Zivotofsky v. Clinton*, 132 S. Ct. 1421 (2012); *id.* at 1240 (Edwards, J., concurring). To hold otherwise, we would have to disregard not only their considered views, but also the Supreme Court's repeated statements to the same effect, *see e.g.*, *Goldwater v. Carter,* 444 U.S. 996, 1007 (1979) (Brennan, J., dissenting) ("Our cases firmly establish that the Constitution commits to the President alone the power to recognize, and withdraw recognition from, foreign regimes." (citing *Sabbatino,* 376 U.S. at 410; *Baker v. Carr,* 369 U.S. 186, 212 (1962); *United States v. Pink,* 315 U.S. 203, 228–30 (1942))), as well as centuries of largely consistent historical practice, *see* Court's Op. at 17–22. Moreover, in light of the President's "primary responsibility for the conduct of our foreign affairs," *New York Times Co. v. United States*, 403 U.S. 713, 741 (1971), locating the recognition power in the Executive branch conforms to our broader constitutional design.

**B.**

The critical question, then, is whether Section 214(d) in fact infringes on the President's exclusive authority to recognize foreign sovereigns. The Secretary's position is straightforward: By preventing passport holders from identifying a place of birth that conflicts with the President's recognition determinations, the Secretary's place-of-birth policy implicates recognition. This is all the more evident in the context of Jerusalem. As Judge Edwards put it, "The Secretary's rules regarding the designation of Jerusalem on passports . . . plainly implement the Executive's determination not to recognize Jerusalem as part of any sovereign regime." *Zivotofsky*, 571 F.3d at 1241–42 (Edwards, J., concurring). Given that the Secretary's place-of-birth policy implicates the recognition power and given that Section 214(d) displaces that policy, the Secretary reasons, the statute unconstitutionally intrudes on the President's recognition power.

Zivotofsky sees things differently. His first and broadest contention is that the President's recognition power, even if exclusive, does not include the power to determine whether certain territory belongs to a particular foreign state. The recognition power may give the President authority to decide whether to recognize a foreign entity as a sovereign, he argues, but it includes no authority to determine that sovereign state's territorial boundaries. This line of argument falls well short of its mark. The power to recognize a sovereign state's territorial boundaries is a necessary corollary to the power to recognize a sovereign in the first place. For instance, recognizing an established sovereign's former colony as a new, independent sovereign seems a straightforward exercise of what even Zivotofsky would concede to be the recognition power. But such recognition necessarily entails a boundary determination— the colony, once formally recognized as part of one sovereign's territory, is effectively recognized as belonging to another.

Indeed, precedent binding on this court confirms that the recognition power includes authority to determine territorial boundaries. *See, e.g.*, *Baker*, 369 U.S. at 212 ("[T]he judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory . . . ."); *Pink,* 315 U.S. at 229–30 (holding that the recognition power is "not limited to a determination of the government to be recognized," but rather includes the power to take actions without which "the power of recognition might be thwarted"); *Williams*, 38 U.S. at 420 ("[W]hen the executive branch of the government . . . assume[s] a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department[.]").

Zivotofsky's narrower argument, powerfully developed in amicus briefs submitted by members of Congress and the Anti-Defamation League, is much stronger. Letting Jerusalem-born individuals choose to designate "Israel" as their place of birth, he contends, neither effects a recognition of Israel's sovereignty over Jerusalem nor otherwise interferes with the President's recognition power. As he emphasizes, nothing in Section 214(d) requires the Secretary to list "Israel" as the place of birth for all Jerusalem-born U.S. citizens. Rather, it merely enables those Jerusalem-born citizens who support Israel to choose to designate their place of birth consistently with that view. Aside from the Secretary's say-so, Zivotofsky goes on to argue, there is simply no reason to conclude that the statute's limited interference with the way the Secretary records a passport holder's place of birth implicates the recognition power. Nor is there reason to believe that implementing Section 214(d) would adversely affect foreign policy. Because affected passports would list "Israel"—not "Jerusalem, Israel"—observers would discern no U.S. policy identifying Jerusalem as part of Israel.

What makes this case difficult is that Zivotofsky is partly right. As the Secretary concedes, *see* Secretary's Br. at 53 n.13,

a primary purpose of the place-of-birth field is to enable the government to identify particular individuals—e.g., by distinguishing one Jane Doe from another born the very same day. And the fact that the Secretary permits individuals to choose to list a city or area of birth instead of a country of birth does tend to suggest that its place-of-birth policy is also about personal identity.

That the Secretary's policy is about identification and personal identity, however, does not mean that it does not also implicate recognition. In fact, it clearly does. Over the years, the Secretary has been incredibly consistent on this point: in no circumstances—including circumstances beyond the Jerusalem issue—can an individual opt for a place-of-birth designation inconsistent with United States recognition policy. *See* 7 FAM 1383.5–1383.7. For example, because the United States never recognized the Soviet Union's annexation of Latvia, Lithuania, and Estonia, the Secretary "did not authorize entry of 'U.S.S.R.' or the 'Soviet Union' as a place of birth" for people born in these areas. 7 FAM 1340 Appx. D. Zivotofsky identifies no deviation from this policy, nor am I aware of one. The Taiwan directive to which Zivotofsky repeatedly points only underscores the Secretary's consistency. Because the United States recognizes Taiwan as an area within China, permitting individuals to list "Taiwan" as their place of birth comports with the Secretary's general policy. Moreover, one cannot possibly read the Foreign Affairs Manual's application of that policy to Jerusalem as anything but an attempt to maintain consistency between the place-of-birth field and the President's decision to recognize no sovereign's claim to that city.

That the Secretary accommodates identity preferences to the extent they are consistent with recognition policy does little to undermine his position that the place-of-birth field in fact implicates recognition. The Secretary has consistently walked a

careful line, permitting individual choice where possible while still ensuring consistency with foreign policy. Because the Secretary's policy is about *both* identification and recognition, Congress could probably pass some laws about the place-of-birth field that do not interfere with the recognition power. For instance, Congress might be able to do little things, like require that the place of birth be listed in a particular font. It might even be able to do bigger things, like eliminate the place-of-birth field all together. Although doing so would inhibit identification of passport holders, it would not seem to interfere with the President's recognition power.

But in enacting Section 214(d), Congress did intrude on the recognition power. The statute seeks to abrogate the Secretary's longstanding practice of precluding place-of-birth designations that are inconsistent with U.S. recognition policy. According to the Secretary, Section 214(d) would also have consequences for the President's carefully guarded neutrality on the question of Jerusalem. Although Zivotfosky challenges the President's judgment that adverse foreign policy consequences would flow from implementing Section 214(d), he offers no reason why the President's exercise of his constitutional power to recognize foreign sovereigns should hinge on a showing of adverse consequences. Even more importantly, courts are not in the business of second-guessing the President's reasonable foreign policy judgments, *cf., e.g.*, *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948), and this one is perfectly reasonable. After all, "[a] passport is, in a sense, a letter of introduction in which the issuing sovereign vouches for the bearer." *Haig v. Agee*, 453 U.S. 280, 292 (1981). And it is certainly plausible, as the Secretary insists, that American-issued passports listing "Israel" as the place of birth for Jerusalem-born citizens could disrupt decades of considered neutrality on the Jerusalem question.

If this were all we had—only the Secretary's reasonable judgment that Section 214(d) infringes on the Executive's exclusive recognition power—it might well be enough. After all, the Supreme Court has held that the recognition power "includes the power to determine the policy which is to govern the question of recognition." *Pink*, 315 U.S. at 229. But there is more. As it turns out, this is not a case in which we must choose between the President's characterization of a statute as implicating recognition and Congress's contrary view. Indeed, Congress was quite candid about what it was doing when it enacted Section 214(d). That subsection is part of a provision titled "United States policy with respect to Jerusalem as the capital of Israel." Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228 § 214, 116 Stat. 1365 (2002). The other sections under that heading are not about passports, they are about recognizing Jerusalem as part of—indeed, as the capital of—Israel. *See id.* And the legislative history makes doubly clear that recognition was Congress's goal. *See* H.R. Conf. Rep. No. 107-671, at 123 (Sept. 23, 2002) (explaining that Section 214 "contains four provisions related to the *recognition* of Jerusalem as Israel's capital" (emphasis added)); *see also* Court's Op. at 36–37 (highlighting similar statements by various members of Congress).

So in the end, this is a separation-of-powers dispute in which both branches involved in the struggle actually agree. Congress intended Section 214(d) to alter recognition policy with respect to Jerusalem, and the President sees it the same way. Our decision makes us the third and final branch to reach this conclusion. And because the recognition power belongs exclusively to the President, that means Section 214(d) is unconstitutional.

## III.

Although the foregoing analysis largely resolves this case, there is one loose end I think merits mention: Zivotofsky's argument that the Secretary's place-of-birth policy discriminates against supporters of Israel. In its most effective formulation, I take the point as follows: Under the Secretary's policy, supporters of Palestine born in Tel Aviv can use their passports to signal their rejection of Israel's claim to sovereignty by choosing to list "Tel Aviv" instead of "Israel" as their place of birth. By contrast, supporters of Israel born in Jerusalem cannot use their passports to signal their view that Jerusalem is part of Israel. Thus, the policy discriminates against Israel supporters, and Section 214(d) remedies that discrimination.

To the extent this is an independent claim that the Secretary's policy is discriminatory, I agree it is waived. *See* Court's Op. at 41. To the extent the argument is that Section 214(d) is constitutional because it remedies unlawful discrimination, such argument cannot overcome the recognition power problem for the same reason the passport power argument cannot: legislation Congress would otherwise have authority to enact may still run afoul of an independent constitutional restraint on congressional action.

I nonetheless think it important to note that the policy is not discriminatory. Indeed, unlike Section 214(d), which permits Jerusalem-born Israel supporters to list "Israel" as their place of birth but allows no parallel option for Jerusalem-born Palestine supporters, the State Department's Foreign Affairs Manual establishes a facially neutral policy that permits individuals to list their city or area of birth in lieu of their country of birth. *See* 7 FAM 1383.5-2; 7 FAM 1383.6(a). The policy applies universally—not just in the context of Jerusalem—and treats Israel and Palestine

supporters identically. Jerusalem-born Americans, whether supporters of Israel or supporters of Palestine, may not use their passports to make a political statement. And that is because permitting a Jerusalem-born individual to list "Israel" or "Palestine" would contradict the President's decision to recognize neither entity's sovereignty over Jerusalem.

True, as Zivotofsky emphasizes with his Tel Aviv example, individuals born within territory the United States has recognized as belonging to Israel can choose either to list "Israel" as their place of birth or instead to list a city or area of birth. Israel supporters may list "Israel," and Palestine supporters may list something more specific. But although the political nature of the latter choice may be clearer insomuch as it marks a deviation from the default country-of-birth rule, that is an unintended consequence of a neutral policy. Indeed, were the United States to recognize the West Bank as the sovereign state of Palestine, the same would be true of Israel supporters born therein. That is, Palestine supporters could list "Palestine," and Israel supporters could make the more obviously political choice to list their city or area of birth. It is only because the United States has not recognized any Palestinian territory that there currently exists no clear analogy to Zivotofsky's Tel Aviv scenario.