*191 Chief Justice Roberts
delivered the opinion of the Court.
Congress enacted a statute providing that Americans born in Jerusalem may elect to have “Israel” listed as the place of birth on their passports. The State Department declined to follow that law, citing its longstanding policy of not taking a position on the political status of Jerusalem. When sued by an American who invoked the statute, the Secretary of State argued that the courts lacked authority to decide the case because it presented a political question. The Court of Appeals so held.
We disagree. The courts, are fully capable of determining whether this statute may be given effect, or instead must be struck down in light of authority conferred on the Executive by the Constitution.
I
A
In 2002, Congress enacted the Foreign Relations Authorization Act, Fiscal Year 2003, 116 Stat. 1350. Section 214 of the Act is entitled “United States Policy with Respect to Jerusalem as the Capital of Israel.” Id., at 1365. The first two subsections express Congress’s “commitment” to relocating the United States Embassy in Israel to Jerusalem. Id., at 1365-1366. The third bars funding for the publication of official Government documents that do not list Jerusalem as the capital of Israel. Id., at 1366. The fourth and final provision, § 214(d), is the only one at stake in this case. Entitled “Record of Place of Birth as Israel for Passport Purposes,” it provides that “[f]or purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary shall, upon the request of the citizen or the citizen’s legal guardian, record the place of birth as Israel.” Ibid.
The State Department’s Foreign Affairs Manual states that “[w]here the birthplace of the applicant is located in ter *192 ritory disputed by another country, the city or area of birth may be written in the passport.” 7 Foreign Affairs Manual §1383.5-2, App. 108. The manual specifically directs that passport officials should enter “JERUSALEM” and should “not write Israel or Jordan” when recording the birthplace of a person born in Jerusalem on a passport. Id., §1383, Exh. 1383.1, App. 127; see also id., §§1383.1, 1383.5-4, .5-5, .5-6, App. 106, 108-110.
Section 214(d) sought to override this instruction by allowing citizens born in Jerusalem to have “Israel” recorded on their passports if they wish. In signing the Foreign Relations Authorization Act into law, President George W. Bush stated his belief that §214 “impermissibly interferes with the President’s constitutional authority to conduct the Nation’s foreign affairs and to supervise the unitary executive branch.” Statement on Signing the Foreign Relations Authorization Act, Fiscal Year 2003, Public Papers of the Presidents, George W. Bush, Vol. 2, Sept. 30, 2002, p. 1698 (2005). He added that if the section is “construed as mandatory,” then it would “interfere with the President’s constitutional authority to formulate the position of the United States, speak for the Nation in international affairs, and determine the terms on which recognition is given to foreign states.” Ibid. He concluded by emphasizing that “U. S. policy regarding Jerusalem has not changed.” Ibid. The President made no specific reference to the passport mandate in § 214(d).
B
Petitioner Menachem Binyamin Zivotofsky was born in Jerusalem on October 17, 2002, shortly after § 214(d) was enacted. Zivotofsky’s parents were American citizens and he accordingly was as well, by virtue of congressional enactment. 8 U. S. C. § 1401(c); see Rogers v. Bellei, 401 U. S. 815, 835 (1971) (foreign-born children of American citizens acquire citizenship at birth through “congressional generosity”). Zivotofsky’s mother filed an application for a con *193 sular report of birth abroad and a United States passport. She requested that his place of birth be listed as “Jerusalem, Israel,” on both documents. U. S. officials informed Zivotof-sky’s mother that State Department policy prohibits recording “Israel” as Zivotofsky’s place of birth. Pursuant to that policy, Zivotofsky was issued a passport and consular report of birth abroad listing only “Jerusalem.” App. 19-20.
Zivotofsky’s parents filed a complaint on his behalf against the Secretary of State. Zivotofsky sought a declaratory judgment and a permanent injunction ordering the Secretary to identify his place of birth as “Jerusalem, Israel,” in the official documents. Id., at 17-18. The District Court granted the Secretary’s motion to dismiss the complaint on the grounds that Zivotofsky lacked standing and that his complaint presented a nonjusticiable political question.
The Court of Appeals for the D. C. Circuit reversed, concluding that Zivotofsky did have standing. It then observed that while Zivotofsky had originally asked that “Jerusalem, Israel,” be recorded on his passport, “[b]oth sides agree that the question now is whether § 214(d) entitles [him] to have just ‘Israel’ listed as his place of birth.” 444 F. 3d 614, 619 (2006). The D. C. Circuit determined that additional factual development might be helpful in deciding whether this question was justiciable, as the parties disagreed about the foreign policy implications of listing “Israel” alone as a birthplace on the passport. Id., at 619-620. It therefore remanded the case to the District Court.
The District Court again found that the case was not jus-ticiable. It explained that “[r]esolving [Zivotofsky’s] claim on the merits would necessarily require the Court to decide the political status of Jerusalem.” 511 F. Supp. 2d 97, 103 (2007). Concluding that the claim therefore presented a political question, the District Court dismissed the case for lack of subject matter jurisdiction.
The D. C. Circuit affirmed. It reasoned that the Constitution gives the Executive the exclusive power to recog *194 nize foreign sovereigns, and that the exercise of this power cannot be reviewed by the courts. Therefore, “deciding whether the Secretary of State must mark a passport... as Zivotofsky requests would necessarily draw [the court] into an area of decisionmaking the Constitution leaves to the Executive alone.” 571 F. 3d 1227,1232-1233 (2009). The D. C. Circuit held that the political question doctrine prohibits such an intrusion by the courts, and rejected any suggestion that Congress’s decision to take “a position on the status of Jerusalem” could change the analysis. Id., at 1233.
Judge Edwards concurred in the judgment, but wrote separately to express his view that the political question doctrine has no application to this case. He explained that the issue before the court was whether § 214(d) “impermissibly intrudefe] on the President’s exclusive power to recognize foreign sovereigns.” Id., at 1234. That question, he observed, involves “commonplace issues of statutory and constitutional interpretation” plainly within the constitutional authority of the Judiciary to decide. Id., at 1235. Reaching the merits, Judge Edwards determined that designating Israel as a place of birth on a passport is a policy “in furtherance of the recognition power.” Id., at 1243. Because in his view the Constitution gives that power exclusively to the President, Judge Edwards found § 214(d) unconstitutional. For this reason, he concluded that Zivotofsky had no viable cause of action, and concurred in affirming the dismissal of the complaint.
Zivotofsky petitioned for certiorari, and we granted review. 563 U. S. 973 (2011).
I — ! HH
The lower courts concluded that Zivotofsky s claim presents a political question and therefore cannot be adjudicated. We disagree.
In general, the Judiciary has a responsibility to decide cases properly before it, even those it “would gladly avoid.” *195 Cohens v. Virginia, 6 Wheat. 264, 404 (1821). Our precedents have identified a narrow exception to that rule, known as the “political question” doctrine. See, e. g., Japan Whaling Assn. v. American Cetacean Soc., 478 U. S. 221, 230 (1986). We have explained that a controversy “involves a political question . . . where there is ‘a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.’ ” Nixon v. United States, 506 U. S. 224, 228 (1993) (quoting Baker v. Carr, 369 U. S. 186, 217 (1962)). In such a case, we have held that a court lacks the authority to decide the dispute before it.
The lower courts ruled that this case involves a political question because deciding Zivotofsky’s claim would force the Judicial Branch to interfere with the President’s exercise of constitutional power committed to him alone. The District Court understood Zivotofsky to ask the courts to “decide the political status of Jerusalem.” 511 F. Supp. 2d, at 103. This misunderstands the issue presented. Zivotofsky does not ask the courts to determine whether Jerusalem is the capital of Israel. He instead seeks to determine whether he may vindicate his statutory right, under § 214(d), to choose to have Israel recorded on his passport as his place of birth.
For its part, the D. C. Circuit treated the two questions as one and the same. That court concluded that “[o]nly the Executive — not Congress and not the courts — has the power to define U. S. policy regarding Israel’s sovereignty over Jerusalem,” and also to “decide how best to implement that policy.” 571 F. 3d, at 1232. Because the Department’s passport rule was adopted to implement the President’s “exclusive and unreviewable constitutional power to keep the United States out of the debate over the status of Jerusalem,” the validity of that rule was itself a “nonjusticiable political question” that “the Constitution leaves to the Executive alone.” Id., at 1231-1233. Indeed, the D. C. Circuit’s opinion does not even mention § 214(d) until the fifth of *196 its six paragraphs of analysis, and then only to dismiss it as irrelevant: “That Congress took a position on the status of Jerusalem %and gave Zivotofsky a statutory cause of action ... is of no moment to whether the judiciary has [the] authority to resolve this dispute ....” Id., at 1233.
The existence of a statutory right, however, is certainly relevant to the Judiciary’s power to decide Zivotofsky’s claim. The federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts’ own unmoored determination of what United States policy toward Jerusalem should be. Instead, Zivotofsky requests that the courts enforce a specific statutory right. To resolve his claim, the Judiciary must decide if Zivotofsky’s interpretation of the statute is correct, and whether the statute is constitutional. This is a familiar judicial exercise.
Moreover, because the parties do not dispute the interpretation of § 214(d), the only real question for the courts is whether the statute is constitutional. At least since Marbury v. Madison, 1 Cranch 137 (1803), we have recognized that when an Act of Congress is alleged to conflict with the Constitution, “[i]t is emphatically the province and duty of the judicial department to say what the law is.” Id., at 177. That duty will sometimes involve the “ [resolution of litigation challenging the constitutional authority of one of the three branches,” but courts cannot avoid their responsibility merely “because the issues have political implications.” INS v. Chadha, 462 U. S. 919, 943 (1983).
In this case, determining the constitutionality of § 214(d) involves deciding whether the statute impermissibly intrudes upon Presidential powers under the Constitution. If so, the law must be invalidated and Zivotofsky’s case should be dismissed for failure to state a claim. If, on the other hand, the statute does not trench on the President’s powers, then the Secretary must be ordered to issue Zivotofsky a passport that complies with § 214(d). Either way, the political question doctrine is not implicated. “No policy underly *197 ing the political question doctrine suggests that Congress or the Executive . . . can decide the constitutionality of a statute; that is a decision for the courts.” Id., at 941-942.
The Secretary contends that “there is ‘a textually demonstrable constitutional commitment’ ” to the President of the sole power to recognize foreign sovereigns and, as a corollary, to determine whether an American born in Jerusalem may choose to have Israel listed as his place of birth on his passport. Nixon, supra, at 228 (quoting Baker, supra, at 217); see Brief for Respondent 49-50. Perhaps. But there is, of course, no exclusive commitment to the Executive of the power to determine the constitutionality of a statute. The Judicial Branch appropriately exercises that authority, including in a case such as this, where the question is whether Congress or the Executive is “aggrandizing its power at the expense of another branch.” Freytag v. Commissioner, 501 U. S. 868, 878 (1991); see, e. g., Myers v. United States, 272 U. S. 52, 176 (1926) (finding a statute unconstitutional because it encroached upon the President’s removal power); Bowsher v. Synar, 478 U. S. 714, 734 (1986) (finding a statute unconstitutional because it “intruded into the executive function”); Morrison v. Olson, 487 U. S. 654, 685 (1988) (upholding a statute’s constitutionality against a charge that it “impermissibly interfere^] with the President’s exercise of his constitutionally appointed functions”).
Our precedents have also found the political question doctrine implicated when there is “ ‘a lack of judicially discoverable and manageable standards for resolving’ ” the question before the court. Nixon, 506 U. S., at 228 (quoting Baker, 369 U. S., at 217). Framing the issue as the lower courts did, in terms of whether the Judiciary may decide the political status of Jerusalem, certainly raises those concerns. They dissipate, however, when the issue is recognized to be the more focused one of the constitutionality of § 214(d). Indeed, both sides offer detailed legal arguments regarding whether § 214(d) is constitutional in light of powers com *198 mitted to the Executive, and whether Congress’s own powers with respect to passports must be weighed in analyzing this question.
For example, the Secretary reprises on the merits her argument on the political question issue, claiming that the Constitution gives the Executive the exclusive power to formulate recognition policy. She roots her claim in the Constitution’s declaration that the President shall “receive Ambassadors and other public Ministers.” U. S. Const., Art. II, §3. According to the Secretary, “[c]enturies-long Executive Branch practice, congressional acquiescence, and decisions by this Court” confirm that the “receive Ambassadors” clause confers upon the Executive the exclusive power of recognition. Brief for Respondent 18.
The Secretary observes that “President Washington and his cabinet unanimously decided that the President could receive the ambassador from the new government of France without first consulting Congress.” Id., at 19 (citing Letter from George Washington to the Cabinet (Apr. 18, 1793), reprinted in 25 Papers of Thomas Jefferson 568-569 (J. Catan-zariti ed. 1992); Thomas Jefferson, Notes on Washington’s Questions on Neutrality and the Alliance with France (May 6, 1793), reprinted in id., at 665-666). She notes, too, that early attempts by the Legislature to affect recognition policy were regularly “rejected in Congress as inappropriate incursions into the Executive Branch’s constitutional authority.” Brief for Respondent 21. And she cites precedents from this Court stating that “[political recognition is'exclusively a function of the Executive.” Banco Nacional de Cuba v. Sabbatino, 376 U. S. 398, 410 (1964); see Brief for Respondent 24-27 (citing, e. g., United States v. Pink, 315 U. S. 203 (1942)).
The Secretary further contends that § 214(d) constitutes an impermissible exercise of the recognition power because “the decision as to how to describe the place of birth . . . *199 operates- as an official statement of whether the United States recognizes a state’s sovereignty over a territorial area.” Brief for Respondent 38. The Secretary will not “list[] as a place of birth a country whose sovereignty over the relevant territory the United States does not recognize.” Id., at 39. Therefore, she claims, “listing ‘Israel’ as the place of birth would constitute an official decision by the United States to begin to treat Jerusalem as a city located within Israel.” Id., at 38-39 (some internal quotation marks omitted).
For his part, Zivotofsky argues that, far from being an exercise of the recognition power, § 214(d) is instead a “legitimate and permissible” exercise of Congress’s “authority to legislate on the form and content of a passport.” Brief for Petitioner 53. He points the Court to Professor Louis Hen-kin’s observation that “ ‘in the competition for power in foreign relations,’ Congress has an ‘impressive array of powers expressly enumerated in the Constitution.’” Id., at 45 (quoting L. Henkin, Foreign Affairs and the United States Constitution 63 (2d ed. 1996)). Zivotofsky suggests that Congress’s authority to enact § 214(d) derives specifically from its powers over naturalization, U. S. Const., Art. I, § 8, cl. 4, and'foreign commerce, id., § 8, cl. 3. According to Zivo-tofsky, Congress has used these powers to pass laws regulating the content and issuance of passports since 1856. See Brief for Petitioner 52 (citing Act of Aug. 18, 1856, §23, 11 Stat. 60).
Zivotofsky contends that § 214(d) fits squarely within this tradition. He notes that the State Department’s designated representative stated in her deposition for this litigation that the “place of birth” entry is included only as “an element of identification.” App. 76 (Deposition of Catherine Barry, Deputy Assistant Secretary of State for Overseas Citizens Services); see Brief for Petitioner 10. Moreover, Zivotofsky argues, the “place of birth” entry cannot be taken as a means *200 for recognizing foreign sovereigns, because the State Department authorizes recording unrecognized territories— such as the Gaza Strip and the West Bank — as places of birth. Brief for Petitioner 43 (citing 7 Foreign Affairs Manual § 1383.5-5, App. 109-110).
Further, Zivotofsky claims that even if § 214(d) does implicate the recognition power, that is not a power the Constitution commits exclusively to the Executive. Zivotofsky argues that the Secretary is overreading the authority granted to the President in the “receive Ambassadors” clause. He observes that in the Federalist Papers, Alexander Hamilton described the power conferred by this clause as “more a matter of dignity than of authority,” and called it “a circumstance, which will be without consequence in the administration of the government.” The Federalist Ño. 69, p. 468 (J. Cooke ed. 1961); see Brief for Petitioner 37. Zivo-tofsky also points to other clauses in the Constitution, such as Congress’s power to declare war, that suggest some congressional role in recognition. Reply Brief for Petitioner 23 (citing U. S. Const., Art. I, § 8, cl. 11). He cites, for example, an 1836 message from President Jackson to Congress, acknowledging that it is unclear who holds the authority to recognize because it is a power “no where expressly delegated” in the Constitution, and one that is “necessarily involved in some of the great powers given to Congress.” Message from the President of the United States Upon the Subject of the Political, Military, and Civil Condition of Texas, H. R. Doc. No. 35, 24th Cong., 2d Sess., 2; see Reply Brief for Petitioner 11-12.
Zivotofsky argues that language from this Court’s precedents suggesting the recognition power belongs exclusively to the President is inapplicable to his claim, because that language appeared in cases where the Court was asked to alter recognition policy developed by the Executive in the absence of congressional opposition. See Brief for Petitioner 44-46; Reply Brief for Petitioner 18-19. Finally, *201 Zivotofsky contends that even if the “receive Ambassadors” clause confers some exclusive recognition power on the President, simply allowing a choice as to the “place of birth” entry on a passport does not significantly intrude on that power.
Recitation of these arguments — which sound in familiar principles of constitutional interpretation — is enough to establish that this case does not “turn on standards that defy judicial application.” Baker, 369 U. S., at 211. Resolution of Zivotofsky’s claim demands careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute and of the passport and recognition powers. This is what courts do. The political question doctrine poses no bar to judicial review of this case.
Ill
To say that Zivotofsky’s claim presents issues the Judiciary is competent to resolve is not to say that reaching a decision in this case is simple. Because the District Court and the D. C. Circuit believed that review was barred by the political question doctrine, we are without the benefit of thorough lower court opinions to guide our analysis of the merits. Ours is “a court of final review and not first view.” Adarand Constructors, Inc. v. Mineta, 534 U. S. 103, 110 (2001) (per curiam) (internal quotation marks omitted). Ordinarily, “we do not decide in the first instance issues not decided below.” National Collegiate Athletic Assn. v. Smith, 525 U. S. 459, 470 (1999). In particular, when we reverse on a threshold question, we typically remand for resolution of any claims the lower courts’ error prevented them from addressing. See, e.g., Bond v. United States, 564 U. S. 211, 214 (2011) (reversing the Court of Appeals’ determination on standing and remanding because the “merits of petitioner’s challenge to the statute’s validity are to be considered, in the first instance, by the Court of Appeals”). We see no reason to depart from this approach in *202 this ease. Having determined that this case is justiciable, we leave it to the lower courts to consider the merits in the first instance.
The judgment of the Court of Appeals for the D. C. Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.