WARDLAW, Circuit Judge,
dissenting:
The United States has determined that the Netherlands afforded the Goudstikker family an adequate opportunity to recover the artwork that is the subject of this litigation. Our nation’s foreign policy is to respect the finality of the Netherlands’ restitution proceedings and to avoid involvement in any ownership dispute over the Cranachs. Because entertaining Mar-ei Von Saher’s state law claims would conflict with this federal policy, I respectfully dissent.
I.
The United States has articulated the foreign policy applicable to the very artwork and transactions at issue here. When Von Saher petitioned for certiorari *728 from our court’s decision rejecting her claims under Cal.Civ.Proc.Code § 354.3 on preemption grounds, the Supreme Court invited the Solicitor General to express the position of the United States on the question there presented. The' United States set forth its policy in an amicus curiae brief signed by Harold Hongju Koh, then the Legal Adviser to the Department of State, and Neal Kumar Katyal, then the Acting Solicitor General.
The United States explained that its post-World War II policy of “external restitution” did not end on September 15, 1948, as our court had determined, but remains extant. After World War II, the United States determined that it would return private property expropriated by the Nazis to its country of origin—that is, “externally”—rather than to its private owners. In turn, the country of origin was responsible for returning the property to its lawful owners through “internal” restitution proceedings. A central purpose of this policy was to avoid entangling the United States in difficult, long-lasting disputes over private ownership. For this reason, the United States expressed its “continuing interest” in the finality of external restitution, “when appropriate actions have been taken by a foreign government concerning the internal restitution of art that was externally restituted to it by the United States following World War II.”
The United States and the international community have also recognized, however, that some countries’ internal restitution processes were deficient. Accordingly, pursuant to such non-binding international agreements as the Washington Principles and the Terezin Declaration, the United States supports ongoing efforts to restore expropriated art to Holocaust victims and their heirs. Furthermore, the United States does not categorically insist upon the finality of its postwar external restitution efforts. Our nation maintains a continuing interest in the finality of external restitution only when the country of origin has taken “appropriate” internal restitution measures. The United States has a “substantial interest in respecting the outcome” of “bona fide” proceedings conducted by other countries. Thus, the policy of the United States, as expressed in its Supreme Court brief, is that World War II property claims may not be litigated in U.S. courts if the property was “subject” or “potentially subject” to an adequate internal restitution process in its country of origin.
The United States not only set forth these general policy principles' in its brief before the Supreme Court, but also explained their application to the very artwork and historical facts presented by this case. According to the United States, the Cranachs “have already been the subject of both external and internal restitution proceedings, including recent proceedings by the Netherlands in response to the Washington Principles.” In the federal government’s considered judgment, these proceedings were “bona fide,” so their finality must be respected. Because the Cranachs were “subject (or potentially subject) to bona fide internal restitution proceedings in the Netherlands,” our nation’s ongoing interest in the finality of external restitution “bar[s] litigation” of the Goudstikkers’ claims in U.S. courts. Simply put, the United States has clearly stated its foreign policy position that it will not be involved in adjudicating ownership disputes over the Cranachs.
II.
The Constitution allocates power over foreign affairs exclusively to the federal government, and the power to resolve private parties’ war claims is “central to the
*729 foreign affairs power in the constitutional design.” Deutsch v. Turner Corp., 324 F.3d 692, 714 (9th Cir.2003). Federal foreign policy preempts Von Saher’s common law claims if “there is evidence of clear conflict” between state law and the policies adopted by the federal Executive. Am. Ins. Ass’n v. Garamendi, 539 U.S. 396, 421, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003). We must determine whether, “under the circumstances,” Von Saher’s state law action “stands as an obstacle to the accomplishment and execution of the full purposes and objectives” of our national foreign policy concerning the resolution of World War II claims. Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (internal quotation marks omitted).
A.
In my view, Von Saher’s attempt to recover the Cranachs in U.S. courts directly thwarts the central objective of U.S. foreign policy in this area: to avoid entanglement in ownership disputes over externally restituted property if the victim had an adequate opportunity to recover it in the country of origin. The majority concludes that Von Saher’s claims do not conflict with federal policy because the Cra-nachs were never subject to any restitution proceedings in the Netherlands. As the United States explained in its amicus brief, however, the relevant issue is whether the Cranachs were subject or potentially subject to bona fide internal proceedings. The majority fails to acknowledge the Executive’s clear determination that the Goudstikkers had an adequate opportunity to assert their claim after the war.
It is beyond dispute that the Cranachs were “potentially subject” to internal restitution proceedings in the Netherlands in the years following World War II. Desi Goudstikker could have filed a claim- for the Cranachs with the Dutch government before the 1951 deadline lapsed. She chose not to do:so because she believed she would not be treated fairly. As the amicus brief explained:
In this case, Ms. Goudstikker settled with the Dutch government in 1952, and that settlement did not provide for the return of artworks like the Cranachs that had been acquired by [Hermann] Goring. When petitioner brought a Dutch restitution proceeding in 1998, the State Secretary found that “directly after the war-—even under present standards—the restoration of rights was conducted carefully.” Petitioner sought review of that decision in the Court of Appeals for the Hague, which found that at the time of the 1952 settlement Ms. Goudstikker “made a conscious arid well considered decision to refrain from asking for restoration of rights with respect to the Goring transaction.”
Thus, the only question is whether the internal restitution proceedings Desi forewent were bona fide.[1] If they were, the United States-has an ongoing interest in their finality and in the finality of the Cranachs’ external restitution to the Netherlands, and U.S. foreign policy expressly bars Desi’s granddaughter-in-law from reviving Desi’s unasserted claim six decades later in federal district court.
The United States has determined as a matter of foreign policy that the postwar process in which Desi declined to participate was bona fide. As the United States explained in its brief, “As both the 1998 and 2004 restitution proceedings reflect, the Dutch government has afforded [Von Saher] and her predecessor adequate op *730 portunity to press their claims, both after the War and more recently.” The majority concludes that this question has not been decisively determined only by finding ways to disavow the State Department’s prior representations to the Supreme Court in this case.
But we lack the authority to resurrect Von Saher’s claims given the expressed views of the United States. The sufficiency of the Netherlands’ 1951 internal restitution process is a quintessential policy judgment committed to the discretion of the Executive. “[I]t is for the political branches, not the Judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments.” Munaf v. Geren, 553 U.S. 674, 700-01, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008). Just as we may not “second-guess” the Executive’s assessment that a prisoner is unlikely to be tortured if transferred to an Iraqi prison, id. at 702, 128 S.Ct. 2207, we may not displace the Executive’s assessment that the Netherlands’ postwar proceedings were adequate. For the federal courts to contradict the State Department on this issue, as is necessary to decide this appeal in Von Saher’s favor, would “compromise! ] the very capacity of the President to speak for the Nation with one voice in dealing with other governments.” [2] Garamendi, 539 U.S. at 424, 123 S.Ct. 2374 (internal quotation marks omitted).
The majority strongly suggests that the federal courts should determine the bona fides of the Netherlands’ 1951 internal restitution process. It acknowledges that the Cranachs were “potentially subject to restitution proceedings” that Desi Goudstikker found unfair. It notes, however, that the Dutch government later “undermined the legitimacy of that restitution process by describing it as ‘bureaucratic, cold and often even callous.’ ” The majority then asserts that it does not “find convincing” the United States’ statement of its foreign policy because it was “presented in a brief in a different iteration of this case that raised different arguments, that involved different sources of law and that seems to have misunderstood some of the facts essential to our resolution of this appeal.”
But we are not at liberty to find that the State Department’s articulation of U.S. foreign policy is not “convincing.” Cf. Zivotofsky ex rel. Zivotofsky v. Clinton, - U.S. -, 132 S.Ct. 1421, 1427, 182 L.Ed.2d 423 (2012) (finding a question jus-ticiable because “[t]he federal courts are not being asked to supplant a foreign policy decision of the political branches”). And it is immaterial whether the Executive expressed our nation’s policy in a Supreme Court amicus brief concerning field preemption, a district court merits brief concerning conflict preemption, an executive agreement unconnected to any litigation, or an official’s testimony before Congress. See Garamendi, 539 U.S. at 416, 123 S.Ct. 2374 (“[V]alid executive agreements are fit to preempt state law... .”); id. at 421, 123S.Ct. 2374 (quoting Ambassador Randolph M. Bell’s statement of U.S. foreign policy in congressional testimony). The majority is correct that we have the discretion to defer, or not, to “the Executive Branch’s view of [a] case’s im *731 pact on foreign policy.” Sosa v. Alvarez-Machain, 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). We have no authority, however, to decide what U.S. foreign policy is. That is the exclusive responsibility of the political branches. See Munaf, 553 U.S. at 700-02, 128 S.Ct. 2207. Here, the Executive has clearly expressed its policy judgment that the process in which Desi declined to participate was adequate. That should be the end of the matter.
B.
The majority further errs by overlooking that the Cranachs were in fact subject to bona fide internal restitution proceedings in the Netherlands in 1998-99 and 2004-06.
In 1998, unaware that the Netherlands no longer possessed the Cranachs, Von Saher filed a claim to recover all of the Goudstikker artworks still in the Dutch government’s possession. The State Secretary found that Von Saher’s claim was untimely and declined to waive the statute of limitations because “directly after the war—even under present standards—the restoration of rights was conducted carefully.” A Dutch appellate court determined it had no jurisdiction to entertain an appeal from this decision and declined to exercise its ex officio authority to grant relief because Desi had “made a conscious and well considered decision” not to pursue restitution after the war.
In 2004, after the Netherlands revised its restitution policy to adopt a more equitable approach in response to the Washington Principles, Von Saher filed another claim. A governmental advisory committee recommended that the claim be granted, reasoning that the claim was “still admissible” despite the prior decisions by the State Secretary and the appellate court. The State Secretary rejected this reasoning, finding that Von Saher’s “restoration of rights” had been “settled” as a legal matter and that her claim fell outside the scope of the Dutch restitution policy. The State Secretary nonetheless decided, as a matter of discretion, to return to Von Saher all of the Goudstikker artworks still in the government’s possession. The Netherlands transferred to Von Saher more than two hundred of the 267 artworks she sought—but not the Cranachs, which had long ago been moved to California.[3]
The majority implausibly concludes that these were not restitution proceedings at all because Von Saher’s restitution claims were time-barred and because the Cranachs were outside their scope. As an initial matter, the United States has expressly determined that the Cra-nachs were subject to a “1998 restitution proceeding” and a “2004 restitution proceeding” in the Netherlands, and that our nation “has a substantial interest in respecting the outcome of that nation’s proceedings.” This policy assessment is probably sufficient to foreclose the majority’s contrary view.[4] See Munaf, 553 *732 U.S. at 702, 128 S.Ct. 2207. Even if it is not, Von Saher did seek “restitution” of the Cranachs, and her filing of claims and the official disposition of those claims do constitute “proceedings.” See Black’s Law Dictionary 1428 (9th ed.2009) (defining “restitution” as “[r]eturn or restoration of some specific thing to its rightful owner or status”); id. at 1324, 128 S.Ct. 2207 (defining “proceeding” as “[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment,” or “[a]ny procedural means for seeking redress from a tribunal or agency”). That Von Saher did not succeed in obtaining her requested relief with respect to the Cranachs does not imply that there were no proceedings pertaining to the Cranachs.
Von Saher’s state law claims conflict with our nation’s “substantial” policy interest in respecting the finality of these two more recent rounds of Dutch proceedings. As the district court explained, these proceedings collectively determined that Von Saher was not entitled to the Cranachs’ restitution as of right, but that the Cra-nachs should nonetheless be returned to her as a matter of discretion if the Netherlands possessed them. Put differently, Dutch authorities finally adjudicated Von Saher’s legal claim to the Cranachs on the grounds that it was procedurally defaulted as a matter of Dutch law. As is routinely recognized in other contexts, allowing Von Saher to relitigate these claims in U.S. courts would necessarily undermine the finality of the Netherlands’ prior proceedings. Cf., e.g., Martinez v. Ryan, - U.S. -, 132 S.Ct. 1309, 1316, 182 L.Ed.2d 272 (2012) (noting that federal litigation concerning claims defaulted in state court undermines the finality of state adjudication). This is precisely what our nation’s foreign policy requires us to avoid.
Because the Cranachs were potentially subject to restitution proceedings initiated by Desi in 1951 and actually subject to restitution proceedings initiated by Von Saher in 1998 and 2004, and because we lack the authority to invalidate the United States’ policy judgment that all of these proceedings were bona fide, I would conclude that federal foreign policy preempts Von Saher’s state law claims.
III.
During their campaign of atrocities in Europe, the Nazis stole precious cultural heritage as they systematically destroyed millions of innocent human lives. Shortly after the Nazi invasion of the Netherlands in 1940, Hermann Goring expropriated a historically significant artwork from the Goudstikker family. Perhaps as restitution for earlier wrongs by another totalitarian regime, George Stroganoff-Scher-batoff later obtained the artwork from the Dutch government in 1966. An acclaimed Southern California museum then acquired the Cranachs in 1971, presumably at a substantial price. Today, they hang in the gallery of the Norton Simon without the consent of the Goudstikkers’ sole heir.
Marei Von Saher and the Museum are both standing on their rights to the Cra- *733 nachs. Their dispute spans decades and continents, and it cannot be resolved in an action under the laws of California or any other U.S. state. The United States has determined, as a matter of its foreign policy, that its involvement with the Cranachs ended when it returned them to the Netherlands in 1945 and the Dutch government afforded the Goudstikkers an adequate opportunity to reclaim them. This foreign policy decision also binds the federal courts, and it should end our many years of involvement with the Cranachs as well. I would affirm the judgment of the district court.

. The majority correctly explains the U.S. government’s position that external restitution alone is not “sufficient of its own force” to bar civil litigation in U.S. courts.

. I would not reach the question of whether Von Saher’s claims are barred by the act of state doctrine because I would affirm the district court’s dismissal of the complaint on the basis that her claims are preempted. I note, however, that adjudicating whether the Netherlands' 1951 proceedings were bona fide may implicate the act of state doctrine because "the outcome” of this inquiry "turns upon[ ] the effect of official action by a foreign sovereign.” W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int’l, 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990).

. In 1961, George Stroganoff-Scherbatoff, heir to the Russian Stroganoff dynasty, filed a restitution claim for the Cranachs in the Netherlands. He asserted that the Cranachs had been wrongfully seized from his family by Soviet authorities and then unlawfully auctioned off to the Goudstikkers. The Dutch government transferred the Cranachs to Stro-ganoff in 1966. Von Saher alleges that these were not restitution proceedings, but simply a sale, and that the Stroganoffs never owned the Cranachs. In 1971, Stroganoff sold the Cranachs to the Norton Simon Art Foundation.

. The majority attempts to draw an unworkable distinction between "explaining federal foreign policy” and “mak[ing] factual determinations.” Our foreign policy often relies on factual assumptions inseparable from the *732 policy itself. For instance, the federal foreign policy that "Iran's pursuit of nuclear weapons is unacceptable” entails a factual assumption that Iran is pursuing nuclear weapons. U.S. Strategic Objectives Towards Iran: Hearing Before the S. Comm, on Foreign Relations, 112th Cong. 7 (2011) (statement of Wendy R. Sherman, Under Secretary of State for Political Affairs). Here, the federal foreign policy that the finality of the Netherlands’ prior restitution proceedings in this case should be respected entails a factual assumption that those proceedings occurred. Von Saher’s attempt to plead to the contrary simply highlights why entertaining her claims would conflict with federal policy.