TATEL, Circuit Judge,
dissenting:
Since July 2011, Abd Al-Rahim Hussein Muhammed Al-Nashiri has repeatedly sought to challenge the government’s authority to try him in a military commission. In his view, none of the offenses with which he is charged occurred in the context of an armed conflict and thus none is triable outside of a civilian court. In one of his latest attempts to raise the issue, Al-Nashiri petitioned the district court for a writ of habeas corpus. That court ultimately concluded that it was required to stay its hand under Schlesinger v. Councilman, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), a case in which the Supreme Court held that equity and inter-branch comity considerations generally require that federal courts refrain from interfering in ongoing court-martial proceedings against American military personnel.
Whether Councilman’s abstention doctrine should be extended to the military commission context to postpone consideration of a Guantanamo detainee’s habeas claim presents a difficult question. In his opinion for the court, Judge Griffith makes a strong case that, as a matter of inter-branch comity, federal courts should respect Congress’s judgment that Article III review of military commission decisions generally occurs only after the military proceedings have run their course — that is, only after final convictions are rendered and affirmed by military authorities. In my view, however, material differences between criminal prosecutions of non-service-members in military commissions and criminal prosecutions of servicemembers in courts-martial lessen the force of the comity and practical considerations that lie at the heart of cases like Councilman, thus significantly undermining the case for abstention.
For instance, one of the primary considerations' — perhaps the primary consideration — -underlying Councilman’s abstention doctrine is the importance of avoiding judicial interference in the military’s unique relationship with its servicemem-bers, which rests on laws and traditions having no counterpart in civilian life and in which the military has singularly relevant expertise. See id. at 757, 759-60, 95 S.Ct. 1300; see also, e.g., Burns v. Wilson, 346 U.S. 137, 140, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (plurality opinion) (“[T]he rights of men in the armed forces must perforce be *139 conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment”). By contrast, judicial consideration of habeas claims related to ongoing military commission proceedings against alien unprivileged enemy belligerents for alleged violations of the laws of war threatens no similar relationship and implicates no similar expertise. Indeed, military commissions are primarily called upon to address questions about the laws of war, a body of international law hardly foreign to federal courts, see, e.g., United States v. Hamidullin, 114 F.Supp.3d 365 (E.D. Va. 2015) (addressing whether a defendant was entitled to combatant immunity under the laws of war); United States v. Lindh, 212 F.Supp.2d 541, 552-53 (E.D. Va. 2002) (same); 18 U.S.C. § 2441 (penalizing war crimes), and questions about the constitutional constraints on military commissions, an area in which Article III courts, not military courts, are especially expert, see, e.g., Zivotofsky v. Clinton, — U.S. -, 132 S.Ct. 1421, 1427-28, 182 L.Ed.2d 423 (2012) (“At least since Mar-burg v. Madison, we have recognized that ... it is emphatically the province and duty of the judicial department to say what the law is.” (internal quotation marks, citation, and alteration omitted)).
Significant structural differences between the. military commission system at issue here and the court-martial system at issue in Councilman further tilt the scales against abstention. For example, in contrast to the court-martial system at issue in Councilman, which has existed since 1950 and which is used in both times of war and times of peace, the present military commission system is temporary and may be utilized only so long as necessary to try those who commit law-of-war offenses during the United States’ current conflict with al Qaeda and its associated forces, see Hamdan v. Rumsfeld, 548 U.S. 557, 597-98, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (plurality opinion) (recognizing as a precondition of military commission jurisdiction that an unlawful enemy combatant be charged with an offense that occurred during the period of hostilities); id. at 683-84, 126 S.Ct. 2749 (Thomas, J., dissenting) (same). The notion that federal courts should delay exercising their habeas jurisdiction out of respect for a system of rarely used and temporary tribunals strikes me as rather odd.
There are, moreover, strong countervailing reasons for giving habeas claims related to military commissions prompt consideration. Most notably, as the last decade and a half has demonstrated, there is little jurisprudence regarding military commissions and their authority. See, e.g., Order, Al Bahlul v. United States, No. 11-1324 (D.C. Cir. Sept. 25, 2015) (granting rehearing en banc to consider, inter alia, whether the Constitution’s Define and Punish Clause empowers Congress to define inchoate conspiracy as a law-of-war offense subject to trial by military commission); Al Bahlul v. United States, 767 F.3d 1, 18 (D.C. Cir. 2014) (en banc) (recognizing it is an open question whether the Constitution’s Ex Post Facto Clause applies to military commission cases at Guantanamo); Hamdan, 548 U.S. at 613, 126 S.Ct. 2749 (holding the military commission procedures established by an executive order invalid). Given that “[tjrial by military commission raises separation-of-powers concerns of the highest order,” Hamdan, 548 U.S. at 638, 126 S.Ct. 2749 (Kennedy, J., concurring), the absence of a well-developed body of law about their use further counsels against abstention.
But even if Councilman-like abstention applies as a general matter to postpone federal courts’ exercise of habeas jurisdiction where it would interfere with active *140 military commissions, I am unconvinced that it should apply in the unique and troubling circumstances of this case.
Significantly, in Councilman — the abstention decision most analogous to this case — the Supreme Court held only that district courts must refrain from exercising their equitable powers to intervene in pending court-martial proceedings when the petitioner is “threatened with no injury other than that incidental to every criminal proceeding brought lawfully and in good faith” — that is, where a petitioner is threatened with nothing more than the usual “cost, anxiety, and inconvenience of having to defend against a single criminal prosecution.” Councilman, 420 U.S. at 754-55, 95 S.Ct. 1300 (internal quotation marks and alteration omitted). The Court expressly noted that it had “no occasion to attempt to define those circumstances, if any, in which equitable intervention into pending court-martial proceedings might be justified,” explaining that it could “discern nothing” in the circumstances of that case that “outweigh[ed] the strong considerations favoring exhaustion of remedies” or that “warrant[ed] intruding on the integrity of military court processes.” Id. at 761, 95 S.Ct. 1300. The Court thus left open the possibility that cases might arise in which extraordinary circumstances would outweigh the equity and comity principles underlying abstention. Id. at 754-55, 761, 95 S.Ct. 1300; cf. Younger v. Harris, 401 U.S. 37, 45-47, 53-54, 91 S.Ct. 746, 27 L:Ed.2d 669 (1971) (recognizing that federal courts must generally abstain from deciding cases that would interfere with pending state criminal proceedings but acknowledging that “extraordinary” or “unusual” circumstances may overcome the equity, comity, and federalism principles that ordinarily require abstention).
Here, it appears that extraordinary and unusual circumstances may well outweigh whatever equity and inter-branch comity principles might otherwise justify Councilman-like abstention. In petitioning for pretrial review of the military commission’s authority to try him, Al-Nashiri alleges that the government subjected him to years of brutal detention and interrogation tactics that left him in a compromised physical and psychological state and that the harms he has already suffered will be exacerbated — perhaps permanently — by the government’s prosecution of him in a military commission. If there is merit to these allegations, the harms he will suffer are truly extraordinary and are a far cry from the ordinary burdens — even serious ones — that individuals endure in the course of defending against criminal prosecutions.
According to the unclassified version of Al-Nashiri’s brief, local authorities in the United Arab Emirates seized him in October 2002 and transferred him to United States custody. Pet’r’s Br. 5. The CIA then detained him at secret locations, commonly referred to as black sites, as part of its “newly-formed Rendition, Detention, and Interrogation (‘RDI’) Program.” Id. Al-Nashiri asserts that this program employed extreme interrogation tactics with the hopes of inducing “learned helplessness” among the detainees. Id. Dr. Sondra S. Crosby, a Department of Defense-appointed expert and a board-certified physician who specializes in treating victims of torture, explains that “learned helplessness” is a concept first introduced in the 1960s by experimental psychologist Dr. Martin Seligman. Crosby Deck ¶ 11. Selig-man’s work, which “consisted of restraining dogs and subjecting them to random and repeated electric shocks,” found that “[djogs that could not control or influence their'suffering in any way ‘learned’ to become helpless, collapsing into a state of passivity.” Id. According to Al-Nashiri, the CIA’s RDI program sought to induce *141 “learned helplessness” in the detainees so that they “might become passive and depressed in response to adverse or uncontrollable events, and ... thus cooperate and provide information.” Pet’r’s Br. 5 (internal quotation marks omitted).
Describing his treatment at the hands of the CIA from 2002 to 2006, Al-Nashiri, in the unclassified version of his brief, which I quote at length, asserts the following:
The first records of Al-Nashiri[’s] treatment [redacted]. He was not allowed to sleep, was regularly beaten, and hung by his hands. After a month, he was transferred to CIA custody and taken to a location codenamed COBALT. In transit to COBALT, ice was put down his shirt. This appears to have been done as part of a broader policy of using transportation between black sites to induce anxiety and helplessness.
Virtually no documentation of Al-Nashiri’s time at COBALT exists. Certain facts can be ascertained from then-prevailing standard operating procedures. The chief of interrogations described COBALT as “good for interrogations because it is the closest thing he has seen to a dungeon, facilitating the displacement of detainee expectations.” COBALT operated in total darkness and the guard staff wore headlamps. [Redacted]. Detainees were subjected to loud continuous noise, isolation, and dietary manipulation.
According to one CIA interrogator, detainees at COBALT “[‘]literally looked like [dogs] that had been kenneled.’ When the doors to their cells were opened, ‘they cowered.’ ” At COBALT, [redacted]. Detainees were fed on an alternating schedule of one meal on one day and two meals the next day. They were kept naked, shackled to the wall, and given buckets for their waste. On one occasion, Al-Nashiri was forced to keep his hands on the wall and not given food for three days. To induce sleep deprivation, detainees were shackled to a bar on the ceiling, forcing them to stand with their arms above their heads. [Redacted].
[Redacted] use of improvised interrogation methods, such as water dousing, wherein a detainee was doused with cold water and rolled into a carpet, which would then be soaked with water in order to induce suffocation.
[Redacted].
[Redacted] Al-Nashiri was kept continually naked and the temperature was kept, in his words, “cold as ice cream.” [Redacted].
The documentation of conditions at [redacted] lacks specificity. Most summaries of interrogation^] say simply [redacted]. There is no question, however, that Al-Nashiri was “waterboarded” at GREEN. This entailed being tied to a slanted table, with his feet elevated. A rag was then placed over his forehead and eyes, and water poured into his mouth and nose, inducing choking and water aspiration. The rag was then lowered, suffocating him with water still in his throat and sinuses. Eventually, the rag was lifted, allowing him to “take 3-4 breaths” before the process was repeated.
[Redacted]
After interrogators questioned Al-Nashiri’s intelligence value, CIA Headquarters sent an untrained, unqualified, uncertified, and unapproved officer to be Al-Nashiri’s new interrogator at BLUE. [Redacted]. Al-Nashiri was kept continually hooded, shackled, and naked. He was regularly strung up on the wall overnight. Al-Nashiri was regularly forced into “stress positions” prompting a Physician’s Assistant to express con *142 cern that Al-Nashiri’s arms might be dislocated.
While prone, this [redacted] interrogator menaced Al-Nashiri with a handgun. The interrogator racked the handgun “once or twice” close to Al-Nashiri’s head. [Redacted].
The [redacted] interrogator also threatened to “get your mother in here,” in an Arabic dialect implying he was from a country where it was common to rape family members in front detainees [sic], [Redacted]. These threats were coupled with “forced bathing” with a wire brush to abrade the skin, [redacted]. There is also evidence Al-Nashiri was, in fact, forcibly sodomized, possibly under the pretext of a cavity search that was done with “excessive force.”
Id. at 9-19 (internal citations and footnote omitted).
In his unclassified brief, Al-Nashiri further claims that at one point
[t]he CIA’s Chief of Interrogations, a person whose presence had previously caused Al-Nashiri to tremble in fear, threatened to resign if further torture was ordered. He wrote that torturing Al-Nashiri is “a train wreak [sic] waiting to happen and I intend to get the hell off the train before it happens.” He then wrote a cable to be “entered for the record” that “we have serious reservations with the continued use of enhanced techniques with [Al-Nashiri] and its long term impact on him. [Al-Nashiri] has been held for three months in very difficult conditions, both physically and mentally. ... [Al-Nashiri] has been mainly truthful and is not withholding significant information. To continue to use enhanced technique[s] without clear indications that he [is] withholding important info is excessive.... Also both C/CTC/RG and HVT interrogator who departed [BLUE] in [REDACTED] January, believe continued enhanced methods may push [al-Nashiri] over the edge psychologically.” Headquarters ordered Al-Nashiri to be tortured further.
Id. at 20 (internal citations omitted) (alterations in original).
According to Al-Nashiri, several years after he was detained as part of the RDI program, the government requested that a competency board evaluate him. “Two psychologists and one psychiatrist conducted interviews with [him] and reviewed numerous documents including summaries of his interrogations, medical assessment notes, and psychological assessment notes from 2002 through 2006.” Id. at 6. They concluded that he suffers from posttraumatic stress disorder (PTSD) and major depressive disorder. Id. at 7.
Al-Nashiri claims that these conditions are “the result — intended result — of the government’s deliberate, years-long campaign to coerce [him] into a state of ‘learned helplessness.’ ” Id. at 9. He further claims that a military trial will greatly aggravate these conditions, with potentially permanent consequences for his mental and physical health. In support, he offers the declaration of his DoD-appointed expert, Dr. Crosby. Based on her examinations of Al-Nashiri, Dr. Crosby believes that he “suffers from complex posttrau-matic stress disorder as a result of extreme physical, psychological, and sexual torture inflicted upon him by the United States.” Crosby Deck ¶¶7, 12. She concludes that the CIA “succeeded in inducing ‘learned helplessness’ ” and that Al-Nashiri is “most likely irreversibly damaged by torture.” Id. Indeed, she writes that in her “many years of experience treating torture victims from around the world,” Al-Nashiri “presents as one of the most severely traumatized individuals [she] ha[s] ever seen.” Id.
*143 After recounting aspects of Al-Nashiri’s treatment and its current impact on his physical and psychological well-being, Dr. Crosby states that “[although, even in the best of circumstances, the horrific and calculated nature of his torture would be expected to have long lasting effects, there are multiple factors that are unique to Guantánamo and the military proceedings against [Al-Nashiri] that are further exacerbating his symptoms and suffering.” Id. ¶ 16. She notes that because Guantanamo was one of the black sites at which he was held, he is regularly “confronted with reminders ... of his time in CIA custody.” Id. ¶ 17. In her opinion, “[sjeeing these reminders particularly when shackled as he often is while moved to and from meetings with counsel and to court, triggers traumatic stress and causes him intense anxiety, dissociation, and painful flashbacks to his experience of torture.” Id. Noting that “[a] key strategy of the CIA’s RDI program was to keep the detention facility’s policies and procedures unpredictable in order to induce helplessness,” Dr. Crosby opines that ongoing instability at Guantanamo “profoundly exacerbates ... Al-Nashiri’s complex PTSD” because he has “no way of differentiating this from the government’s prior deliberate efforts to destabilize his personality.” Id. ¶¶ 20-21.
Dr. Crosby further believes that, “[a]t present, the military trial process is a principal driver of this instability” and Al-Nashiri’s condition. Id. ¶ 22. She states, for example, that “the ad hoc character of the proceedings,” in which the government seeks to impose death, causes Al-Nashiri “profound anxiety,” id. ¶ 23, and that the “lack of continuity of [his] defense team” due to military personnel rules undermines his ability to build trusting relationships with his attorneys, id. ¶ 24.
While recognizing that a capital trial in any tribunal would be stressful, Dr. Crosby states that her understanding of “the more predictable procedures of federal confinement and trials causes [her] to believe that the contemplated military trial is stressful on a different order of magnitude and, given ... Al-Nashiri’s situation and fragile psychological state induced by torture, exponentially more harmful.” Id. ¶26. She has “serious doubts” about his ability to “remain physically and mentally capable of handling the physical and emotional stress of the military trial process,” and she “fear[s]” that, if forced to undergo a military trial, Al-Nashiri “will eventually decompensate” with “permanently disabling effect[s] on his personality and his capacity to cooperate meaningfully with his attorneys.” Id. ¶ 27.
In its responsive brief, the government contests neither Al-Nashiri’s allegations regarding his past treatment nor the potential consequences of a capital trial in a military commission. Instead, the government insists that those allegations are irrelevant because the burdens attendant to defending against criminal prosecutions are insufficient to overcome the equity and inter-branch comity principles that justify abstention in cases like Councilman. See Resp’t’s Br. 61. But as noted above, Councilman held only that the ordinary burdens of defending against criminal prosecutions, however serious, are insufficient to outweigh such considerations. If there is merit to Al-Nashiri’s allegations regarding his treatment and to Dr. Crosby’s assessment of his current condition and the consequences of proceeding with a military trial, then Al-Nashiri is threatened with far more than the harms “incidental to every criminal proceeding brought lawfully and in good faith.” Councilman, 420 U.S. at 754, 95 S.Ct. 1300 (internal quotation marks omitted). Indeed, the alleged burdens he faces are not only unusual, but *144 extraordinary. He contends that because the executive branch, the very authority that now seeks to try him, subjected him to years of brutal detention and interrogation tactics — “torture” in the words of his DoD-appointed expert — he suffers from psychological disorders that will be aggravated by a capital trial in a military commission. Surely, such circumstances — if true — would outweigh the equity and inter-branch comity principles that might otherwise call for abstention. See id. at 761.
The district court, in invoking Councilman’s, abstention doctrine, failed to address whether Al-Nashiri’s potential harms involve the kind of extraordinary circumstances that could warrant federal court intervention in pending military commission cases. In an alternative ruling on Al-Nashiri’s motion for a preliminary injunction, the district court did state that Al-Nashiri failed to show the sort of irreparable injury necessary to obtain injunctive relief. Al-Nashiri v. Obama, 76 F.Supp.3d 218, 222 n.3 (D.D.C. 2014). Its explanation consisted of a single sentence: “ ‘[T]he inconvenience of any criminal prosecution, including those associated with the military commissions, is insufficient, standing alone, to warrant federal court intervention.’ ” Id. (quoting Al Odah v. Bush, 593 F.Supp.2d 53, 58 (D.D.C. 2009)). In reaching this conclusion, the court ignored Al-Nashiri’s assertions that the unusual and extraordinary circumstances of his confinement had caused serious physical and psychological harms that would be severely aggravated by trial in a military commission. Indeed, without giving Al-Nashiri the opportunity to submit classified declarations about those harms, as his counsel had requested, the court determined that any harms involved in defending against a criminal prosecution could not qualify as irreparable.
In my view, the district court erred in concluding that the types of harms Al-Nashiri asserts are governed by the general rule that federal courts must decline to exercise their equitable powers when individuals face no harms other than those ordinarily involved in defending against criminal prosecutions. Al-Nashiri asserts potential injuries different in both degree and kind from those normally sustained in the course of criminal proceedings. Cf. McLucas v. DeChamplain, 421 U.S. 21, 33, 95 S.Ct. 1365, 43 L.Ed.2d 699 (1975) (“[T]he only harm DeChamplain claimed in support of his prayed for equitable relief was that, if convicted, he might remain incarcerated pending review within the military system.”). As a result, even putting aside my concerns about applying a Councilman-like abstention doctrine to delay federal court consideration of habeas claims related to the current military commission system, I would remand this case to the district court for fact-finding with respect to Al-Nashiri’s alleged harms and for a determination of whether those harms are sufficient to overcome the equity and inter-branch comity principles that might.otherwise justify abstention. If the district court — after taking whatever fact-finding steps it deemed necessary, such as conducting an evidentiary hearing — were to determine that Al-Nashiri’s alleged harms are as serious as he claims, they would no doubt qualify as the kind of extraordinary circumstances that “outweigh” whatever equity and inter-branch comity principles might underlie Councilman-like abstention. If they do not qualify as such, it would .be hard to imagine any that would.
The court dismisses these circumstances as insufficient. Drawing upon cases applying the Younger abstention doctrine, which requires that courts generally refrain from exercising jurisdiction where doing so would interfere with state proceedings im *145 plicating important state interests, the court states that “the ‘extraordinary circumstances’ exception” applies only where a petitioner can show that “he will suffer a ‘great and immediate’ harm absent federal-court intervention” and “the alternative tribunal is ‘incapable of fairly and fully adjudicating the federal issues before it.’ ” Majority Op. at 128-29 (quoting Kugler v. Helfant, 421 U.S. 117, 123-24, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975)). According to the court, Al-Nashiri’s claims “say nothing about the competence of the military commission,” and thus “do[ ] not bring [Al-Nashiri’s] harms under the limited and narrow meaning of the exception.” Id. at 34-35, 95 S.Ct. 1365.
As an initial matter, I am skeptical that even in the context of Younger abstention, Al-Nashiri’s circumstances could not qualify as the sort of extraordinary circumstances that could outweigh the equity, comity, and federalism principles generally dictating abstention. Although some statements from the Younger line of cases may be read to limit Younger1 s “extraordinary circumstances” exception to situations in which state tribunals cannot be expected to fairly and fully adjudicate litigants’ claims for reasons such as bias and bad faith, see Kugler, 421 U.S. at 124, 95 S.Ct. 1524, the Supreme Court has never addressed a situation like the one we. face here.
But putting those doubts aside, I am unpersuaded that we must apply the same sort of “extraordinary circumstances” exception as that developed in the Younger line of cases. Contrary to the court’s suggestion, there is no single rule of abstention, with a single “extraordinary circumstances” exception. See Majority Op. at 128-29. Instead, drawing upon similar but distinct principles, the Supreme Court has developed a variety of abstention doctrines that seek to address, in the ordinary case, the appropriate balance between individual interests in federal court adjudication and considerations of equity and comity. In Younger, for instance, the Supreme Court held that absent bad faith, harassment, enforcement of a patently unconstitutional statute, or other “unusual” circumstances, considerations of equity, comity, and federalism demand abstention in cases related to certain state proceedings. See, e.g., Kugler, 421 U.S. at 123-24, 95 S.Ct. 1524. Later, in Councilman the Court held that where a servicemember is threatened with nothing more than the ordinary burdens involved in defending against a criminal prosecution in a court-martial, equity and inter-branch comity considerations require abstention. See Councilman, 420 U.S. at 754-58, 761, 95 S.Ct. 1300.
Importantly, each of these abstention doctrines balanced different considerations. That much is evident from the fact that Councilman abstention includes an exception that Younger does not — specifically, for challenges to a court-martial’s personal jurisdiction over a litigant. See Councilman, 420 U.S. at 759-60, 95 S.Ct. 1300; Hamdan, 548 U.S. at 585 n.16, 126 S.Ct. 2749. The Court determined that in cases presenting such challenges, the abstention calculus comes out differently, namely, in favor of federal courts exercising their jurisdiction. See Councilman, 420 U.S. at 759-60, 95 S.Ct. 1300.
Because the Supreme Court’s abstention doctrines involve distinct balancing calculations, I am unconvinced'that any limits the Court may have imposed on the sorts of “extraordinary circumstances” that can outweigh the justifications for abstention in cases related to ongoing state proceedings necessarily apply in cases involving Councilman abstention. No decision compels that view. And I certainly do not believe that those conclusions are disposi-tive regarding the sorts of circumstances *146 that may outweigh whatever equity and inter-branch comity principles might generally require abstention in cases — like this one — that relate to pending military commission cases against non-servicemem-bers. As noted above, the considerations involved in each are different. See supra, at 112-13, 119. Consequently, the circumstances justifying federal court intervention may also differ.
Here, we are not confronted with a separate sovereign seeking to vindicate important interests as it sees fit. Instead, we are faced with the federal executive branch’s assertion that it should get the first crack at deciding Al-Nashiri’s substantial constitutional and statutory challenges to a military commission’s authority to try him even though Al-Nashiri may, because of the executive branch’s past actions, suffer severe and permanent injuries from the exercise of its jurisdiction. Further, the military commission has concluded that it will not fully determine its own jurisdiction, in the first instance, until trial. By the time Al-Nashiri has an opportunity for meaningful judicial review, the extraordinary injuries may well have occurred.
When the notions of equity and inter-branch comity articulated by the court are considered against Al-Nashiri’s unusual and extraordinary allegations of harm, as well as the long-established principle that it is the judiciary’s duty to ultimately say what the law is, see Zivotofsky, 132 S.Ct. at 1427-28, I believe that abstention— again, assuming Al-Nashiri’s allegations are true — is unwarranted.